Filed 9/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOE VINCENT ROMEO,<br><br>    Defendant and Appellant. | A140146<br><br>(Contra Costa County<br>Super. Ct. No. 51318039) |

" '[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' [Citations.] Likewise, a garage that is attached or adjacent to a home may give rise to a legitimate expectation of privacy therein. [Citations.] Under the Fourth Amendment, a warrantless search of such an area is unreasonable per se unless it falls within a recognized exception to the warrant requirement, for example, where consent to the search has been given." (*People v. Robles* (2000) 23 Cal.4th 789, 795 (*Robles*).)

In this case, Appellant Joe Vincent Romeo was living in a garage attached to the home of two probationers. Police conducted a warrantless search of the home, detaining Appellant in handcuffs during the search, and found methamphetamine in the garage. While detained, Appellant admitted the drugs were his. He later pled guilty to possession (Health & Saf. Code, § 11377, subd. (a)) and now appeals from the denial of his motion to suppress. The appeal presents the question whether the justification for the search—advance consent, based on the probation status of Appellant's hosts—overcomes the presumption of unreasonableness. For the reasons explained below, we conclude that, on this record, it does not. Accordingly, we reverse.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2013, Appellant was charged by complaint with possession of a controlled substance (methamphetamine) (Health & Saf. Code, § 11377, subd. (a)) and misdemeanor being under the influence of a controlled substance (methamphetamine) (Health & Saf. Code, § 11550, subd. (a)). On August 22, 2013, he filed a motion to suppress evidence pursuant to Penal Code[1] section 1538.5, arguing that both the search of his living quarters and the seizure of his person had been unreasonable and violated his rights under the Fourth Amendment. He filed a written motion to suppress both the items found in the garage and his statement acknowledging they were his. The motion was very brief, but did raise a specific challenge to the search team's basis for conducting a probation search, citing *People v. Harvey* (1958) 156 Cal.App.2d 516 (*Harvey*) and *People v. Madden* (1970) 2 Cal.3d 1017 (*Madden*), among other authorities. The motion was heard before a magistrate concurrently with the preliminary examination on August 29, 2013.

At the hearing, Martinez Police Officer Dirk Miller testified that on November 8, 2012 at approximately 10:00 a.m., he and Sergeant Glen Walkup, along with six other officers, performed a warrantless probation search of 628 Walnut Avenue in Martinez (628 Walnut Avenue), the home of Randy Mills and Julie Bolstad. Officer Miller testified that Mills and Bolstad were the targets of the probation search. Nothing in his testimony, however, indicated whether he or anyone else on his search team had grounds to suspect criminal activity was taking place at 628 Walnut Avenue. The sole justification for the search, as Officer Miller explained it, was that Mills and Bolstad were probationers subject to search.

At the beginning of his testimony, Officer Miller testified that he knew Mills and Bolstad were "on probation with [a] search clause" and that he "confirmed" their

---

[1] Statutory references, unless otherwise indicated, are to the Penal Code.

2

probation status using a "countywide computer system called ARIES."[2]  The magistrate sustained hearsay and lack of foundation objections to this testimony and granted a motion to strike.  Following these rulings, the prosecutor posed a series of preliminary questions about the basis of Officer Miller's knowledge.  Without providing any detail, Officer Miller testified that, prior to the search, he had unspecified "personal contact with" Mills and Bolstad and he was "familiar" with them.[3]  Officer Miller also testified that he uses ARIES routinely in the course of his duties, that he has been trained in the use of ARIES, and that "you can get probation information" from ARIES, which "is what I did in this case."  In view of this further testimony, and over renewed objections, the magistrate allowed Officer Miller's testimony that he had "personal knowledge" Bolstad and Miller were on probation subject to a probation search clause and that he had confirmed their probationary status using ARIES.

After explaining why he believed Mills and Bolstad were on probation and subject to search, Officer Miller summarized what happened upon the search team's arrival at 628 Walnut Avenue as follows.  Sergeant Walkup knocked and announced the team's presence.  Officer Miller then saw Bolstad approach the front door from the direction of the interior door leading to the garage.  When she opened the front door, Officer Miller saw Appellant in the bathroom, whom Officer Miller had known for his "whole career" (12 years).  The officers entered with their guns drawn, handcuffed Appellant and Bolstad, and escorted them to the driveway.  Officer Miller testified to the effect it is standard procedure in his department to handcuff and detain anyone found on the premises when conducting a search.  "It's our―the way we do things, we handcuff everybody that's involved."

---

[2] The Sheriff's Department and other law enforcement agencies in Contra Costa County utilize a computer database system called the Automated Regional Information Exchange System (ARIES) (See Hunter, *Automated Regional Information Exchange System User Satisfaction Survey Results* (August 30, 2006) <http://hunterdk.com/wp–content/uploads/2012/11/ SURVEYARIES.pdf > [as of Sept. 22, 2015].)

[3] Officer Miller was not asked anything about this prior "personal contact" with Mills and Bolstad and he said nothing about the circumstances surrounding it.

While performing a protective sweep through the house, which took some five to ten minutes, police located Bolstad's brother and father in a back bedroom. The officers removed them and began the probation search. Mills was not present in the house when the officers arrived, but he was located about a block away and transported by police to his home about half an hour after the search began, where he was detained with the others. Within the first ten minutes, the officers located hypodermic needles in a bedroom that had been pointed out by Bolstad as the one she shared with Mills. The needles were found in a dresser drawer next to the bed in the closet.

Officer Miller also searched the attached garage because "the whole family lived in [the house] and had access to [the garage]." As Officer Miller entered the garage, he noticed it was arranged as living quarters would be. "It had a couch in it; had a large desk with a TV and computer on it." Officer Miller observed, in plain view on top of the desk, a clear Ziploc baggie containing 2.444 grams of methamphetamine. He also recovered a small amount of marijuana, wrapped in cellophane, from a cigarette box on top of the desk, as well as six hypodermic needles from a toolbox in the garage. The drugs were found approximately 45 minutes after the search began. Officer Miller then went outside to discuss the discovered contraband with the detainees. The probation search lasted for approximately an hour all told.

During the search, Sergeant Walkup watched the detainees in the driveway. After Walkup overheard other officers discussing the methamphetamine found in the garage, he *Mirandized*[4] Appellant, Bolstad and Mills and asked them about the drugs. Appellant told Walkup he was staying in the garage and admitted the methamphetamine, marijuana and hypodermic needles found in the garage were his.[5] Walkup reported Appellant's admission to Officer Miller. After observing Appellant more closely, Officer Miller suspected he was under the influence of a controlled substance because he appeared nervous and spoke rapidly. Officer Miller arrested Appellant and drove him to the police

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

[5] Appellant also told Miller he slept on the couch in the garage.

4

station. At the police station, Officer Miller conducted several sobriety tests, and Appellant failed them all. A phlebotomist called to the jail drew a sample of Appellant's blood. The phlebotomist had difficulty drawing the blood because Appellant's veins were collapsed from years of shooting drugs. Appellant's blood tested positive for methamphetamine and opiates.

At the conclusion of the suppression hearing, defense counsel challenged the officers' warrantless search of the residence at 628 Walnut Avenue as unlawful, arguing that the prosecution had failed to establish the existence and scope of the probation search condition. Defense counsel further contended that Appellant's detention was a de facto arrest without probable cause because he was handcuffed for 45 minutes during the probation search. The prosecution countered that the testimony of Officer Miller established the existence and scope of the probation search condition because he testified he had personal knowledge of the probationers' search conditions, and the ARIES database confirmed their current status as probationers. The prosecution also argued that (1) Appellant's privacy rights in the shared common areas of their residence were limited because he lived with probationers subject to warrantless search, and (2) the officers were allowed to briefly detain nonprobationers during a residential probation search.

The magistrate denied the suppression motion and held Appellant to answer on the complaint. Her full explanation was as follows: "I don't believe that this search vis-à-vis Mr. Romeo was improper and that he was not detained for a long period of time." She did not specifically address or make any express findings concerning Officer Miller's knowledge of the existence and scope of probation search conditions justifying a warrantless search of 628 Walnut Avenue. A renewed motion to suppress, filed with the superior court along with a section 995 motion to set aside the information, was denied on substantially the same grounds, based on the same record.

On October 16, 2013, Appellant pled guilty to the possession charge and the district attorney dismissed the misdemeanor count for being under the influence. The court sentenced Appellant to a split sentence of four months in county jail, followed by 32 months on mandatory supervision. With credit for presentence custody, Appellant

5

was released immediately after sentencing.  Appellant appealed, raising solely issues related to the denial of his suppression motion and his section 995 motion.

On appeal, Appellant argues that (1) the People failed to justify the warrantless search of 628 Walnut Avenue because (a) the only proof that Mills and Bolstad were on probation subject to search derived from the ARIES database, and since ARIES is an "official channel" of information, the *Harvey-Madden* rule requires independent evidence of reliability, which was never supplied, and (b) there is no evidence in the record of the specific terms of the probation search condition and, since the scope of a probation search is bounded by the terms of the probation order involved, it is impossible to determine whether in searching the residence the officers went beyond the permitted scope of search; (2) even if the officers were justified in entering the house without a warrant, they acted unreasonably and in violation of the Fourth Amendment by entering and searching the attached garage, which was set up as separate living quarters; and (3) the officers unreasonably seized Appellant when they detained him in handcuffs for 45 minutes while they conducted the search of the house.

We reject Appellant's *Harvey-Madden* argument, but find merit in his contention that the prosecution failed to present sufficient evidence of the existence and scope of a probation search clause to justify a warrantless search of the residence at 628 Walnut Avenue.  We reverse on that ground and have no occasion to reach the remainder of Appellant's arguments.

## DISCUSSION

### I.  Legal Landscape and Standard of Review

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.)  Because the " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' " "[i]t is a 'basic principle of Fourth

6

Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (*Payton v. New York* (1980) 445 U.S. 573, 585–586, fn. omitted.)

When a defendant raises a challenge to the legality of a warrantless search or seizure, the People are obligated to produce proof sufficient to show, by a preponderance of the evidence, that the search fell within one of the recognized exceptions to the warrant requirement. (*People v. James* (1977) 19 Cal.3d 99, 106, fn. 4; *People v. Rios* (2011) 193 Cal.App.4th 584, 590 (*Rios*).) A probation search is one of those exceptions. (*People v. Schmitz* (2012) 55 Cal.4th 909, 916; *People v. Woods* (1999) 21 Cal.4th 668, 674–675 (*Woods*) [probation exception based on advance consent].) This is because a "probationer . . . consents to the waiver of his Fourth Amendment rights in exchange for the opportunity to avoid service of a state prison term," except insofar as a search might be "undertaken for harassment or . . . for arbitrary or capricious reasons." (*People v. Bravo* (1987) 43 Cal.3d 600, 608, 610 (*Bravo*); accord, *People v. Medina* (2007) 158 Cal.App.4th 1571, 1577 (*Medina*).)

Because the terms of probation define the allowable scope of the search (*Bravo, supra*, 43 Cal.3d at pp. 606, 608), a searching officer must have "advance knowledge of the search condition" before conducting a search. (*In re Jaime P.* (2006) 40 Cal.4th 128 (*Jaime P.*); accord, *People v. Durant* (2012) 205 Cal.App.4th 57, 64 ["a police officer who relies on a probation condition to justify an otherwise illegal search or seizure must know of that condition when he acts"]; *Medina, supra*, 158 Cal.App.4th at p. 1577 [search must be conducted "pursuant to a known probation search condition"]; *Myers v. Superior Court* (2004) 124 Cal.App.4th 1247, 1252 ["officer must know the person is on probation at the time of the search"].) Without such advance knowledge, the search cannot be justified as a proper probation search, for the officer does not act pursuant to the search condition. (*People v. Sanders* (2003) 31 Cal.4th 318, 333 (*Sanders*) [parole search]; *People v. Middleton* (2005) 131 Cal.App.4th 732, 738 (*Middleton*) [same].) As the Supreme Court has held, "a search founded on neither reasonable suspicion of criminal activity nor advance knowledge of a probation search condition can aptly be

7

characterized as arbitrary." (*Jaime P., supra*, 40 Cal.4th at p. 138; see *People v. Hoeninghaus* (2004) 120 Cal.App.4th 1180, 1188 (*Hoeninghaus*).)

Section 1538.5 affords criminal defendants a procedure by which they may seek suppression of illegally seized evidence. (§ 1538.5, subds. (a)(1), (d), (f)(1), (i), (m).) Our high court has said that section 1538.5 "provides a comprehensive and exclusive procedure for the final determination of search and seizure issues prior to trial." (*People v. Brooks* (1980) 26 Cal.3d 471, 475.) Under section 1538.5, subdivision (f)(1), a motion to suppress may be filed independently or at the preliminary hearing. The Evidence Code, including hearsay rules, applies to section 1538.5 motions. (Evid. Code, §§ 130, 300; *Hewitt v. Superior Court* (1970) 5 Cal.App.3d 923, 927.)

"Section 1538.5, by its terms, authorizes a motion to suppress if '[t]he search or seizure without a warrant was *unreasonable.*' " (*People v. Williams* (1999) 20 Cal.4th 119, 129 (*Williams*).) This requires that the "defendant[] must do more than merely assert that the search or seizure was without a warrant. The search or seizure must also be unreasonable; that is, it must not fall within any exception to the warrant requirement." (*Ibid.*) A three-step allocation of the burden of producing evidence governs, with the ultimate burden of persuasion always remaining on the People. "[W]hen defendants move to suppress evidence, they must set forth the factual and legal bases for the motion, but they satisfy that obligation, at least in the first instance, by making a prima facie showing that the police acted without a warrant. The prosecution then has the burden of proving some justification for the warrantless search or seizure, after which, defendants can respond by pointing out any inadequacies in that justification." (*Id*. at p. 136.) The prosecution retains the ultimate burden of "proving that the warrantless search or seizure was reasonable under the circumstances." (*Id.* at p. 130.)

When a suppression motion is made before a magistrate in conjunction with a preliminary hearing, as in this case, the magistrate tries the facts, resolving credibility issues and conflicts in the evidence, weighing the evidence, and drawing appropriate inferences. (*People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1244; see § 1538.5, subd. (f)(1).) If the magistrate denies the motion and holds the defendant to answer, the

defendant must, as a prerequisite to appellate review, renew his challenge before the trial court by motion to dismiss under section 995 or in a special hearing.  (*People v. Lilienthal* (1978) 22 Cal.3d 891, 896; § 1538.5, subds. (i), (m).)  At that stage, the evidence is generally limited to the transcript of the preliminary hearing, testimony by witnesses who testified at the preliminary hearing (who may be recalled by the prosecution), and evidence that could not reasonably have been presented at the preliminary hearing. (§ 1538.5, subd. (i).)  The factual findings of the magistrate are binding on the court, except as affected by any additional evidence presented at the special hearing.  (*Ibid.*)

We, too, are "concerned solely with the findings of the [magistrate]."  (*People v. Gentry* (1992) 7 Cal.App.4th 1255, 1262.)  After submission on the transcript at the special hearing, the appellate court, like the superior court, is bound by the magistrate's factual findings so long as they are supported by substantial evidence.  (*People v. Hua* (2008) 158 Cal.App.4th 1027, 1033; *People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223–1224.)  On review of the superior court ruling by appeal or writ, a two-step standard of review applies.  In the first step of our review, "we in effect disregard the ruling of the superior court and directly review the determination of the magistrate." *(People v. Shafrir, supra,* 183 Cal.App.4th at p. 1244.)  At this stage, we consider the record in the light most favorable to the People since "all factual conflicts must be resolved in the manner most favorable to the [superior] court's disposition on the [suppression] motion." (*People v. Martin* (1973) 9 Cal.3d 687, 692.)

Accepting as established all implied or express factual findings by the magistrate as are supported by substantial evidence, we then proceed to measure those findings against Fourth Amendment standards articulated by the United States Supreme Court.  (*People v. Nottoli* (2011) 199 Cal.App.4th 531, 545.)  At this stage, we independently apply the law to the factual findings (*Ornelas v. United States* (1996) 517 U.S. 690, 699 (*Ornelas*); *People v. Loewen* (1983) 35 Cal.3d 117, 123), determining de novo whether the factual record supports the magistrate's conclusion that the challenged search met the constitutional standard of reasonableness. (*Ornelas, supra,* at

9

pp. 696–697 [determination of reasonable suspicion a mixed question of law and fact reviewable independently]; *People v. Lawler* (1973) 9 Cal.3d 156, 160 (*Lawler*) [same].)

## II. Justification for the Warrantless Search of 628 Walnut Avenue

### A. The *Harvey-Madden* Rule

In a series of cases dating from the 1950s the California courts developed what came to be known as the *Harvey-Madden* rule. The rule takes its name from *People v. Harvey*, *supra*,156 Cal.App.2d 516, decided by Division Two of this court in 1958, and *People v. Madden, supra*, 2 Cal.3d 1017, decided by the California Supreme Court in 1970. In *Harvey,* two officers were instructed to " ' "stake out" ' " an area near the defendant's home. (*Id.* at p. 519.) They were told by their departmental superiors that the defendant " 'had been under surveillance . . . for some time and that he was believed to be dealing in narcotics.' " (*Id.* at p. 519.) The officers were also told to arrest the defendant if they believed " ' "something was wrong." ' " (*Ibid.*) Upon encountering the defendant, the officers did not did not observe any criminal activity; nevertheless, they made a warrantless arrest and found a package of marijuana on defendant's person. (*Id.* at pp. 519–520.) On appeal from the ensuing conviction for drug possession, the defendant challenged the legality of the arrest and search. This court found that the information the arresting officers had about defendant was "of a very vague nature. One of [them] . . . testified that he had only seen an informant (who had worked on a different case) talking to his superior officer. The officer admitted that he did not hear the conversation and did not know what it was about." (*Id.* at p. 521.) Finding it was clear that "the arrest was made solely in reliance on the information and briefing from [their departmental superiors]" (*ibid.*) , the court held proof of probable cause was lacking, and reversed (*id.* at p. 522).

Twelve years later, in *Madden*, another case involving suspected narcotics trafficking reported second-hand to an officer in the field, our Supreme Court endorsed and applied *Harvey*. From today's standpoint, the significance of the *Harvey-Madden* rule is perhaps best understood by considering the change in the law it effected. Until the Supreme Court embraced *Harvey*, some courts of appeal took a distinctly uncritical view

10

of the evidentiary burden placed on the prosecution when it was called upon to establish probable cause for a warrantless search or seizure.  Under a line of cases that for years were in tension with *Harvey*, these courts held that the law supplies an evidentiary presumption permitting police officers to rely on information coming to them from official sources.  "The information provided by one police department to another," these courts held, "must be *presumed reliable* unless it [was] manifestly shown to be otherwise." (*People v. Schellin* (1964) 227 Cal.App.2d 245, 251, italics added; see *People v. Gardner* (1967) 252 Cal.App.2d 320, 325, 326, fn. 2.)  The Supreme Court's decision in *Madden* put to rest the idea that an officer challenged to justify a warrantless search or seizure may simply refer to information obtained through "official channels," without any need to establish the basis for that information.[6] (*Madden, supra,* 2 Cal.3d at p. 1021.)  The durability of the *Harvey-Madden* rule as a basic feature of criminal procedure in California is evident in *People v. Brown* (2015) 61 Cal. 4th 968 (*Brown*), where the court recently applied it, explaining the rule as follows.  "An officer may arrest or detain a suspect 'based on information received through "official channels." ' " (*Id.* at p. 983.)  Upon proper objection, however, " ' " 'the People must prove that the source of the information is something other than the imagination of the officer who does not become a witness' " ' " by offering evidence that the source has " 'sufficient indicia of reliability.' " (*Ibid.*)   *Harvey-Madden* is a close cousin of the exclusionary rule—and in some respects operates similarly to it (e.g., subjecting certain evidence proffered to

---

[6]  Although the two cases most commonly cited as foundational in this line of precedent are *Harvey* and *Madden* (see *People v. Rogers* (1978) 21 Cal.3d 542, 547 (the rule is "epitomized by" *Harvey* and *Madden*), its earliest application by the California Supreme Court came in *People v. Lara* (1967) 67 Cal**.**2d 365 (*Lara*) and *Remers v. Superior Court* (1970) 2 Cal.3d 659 (*Remers*).  Both *Lara* and *Remers* are cited in *Madden*.  The rule announced in these cases is occasionally referred to as *Harvey-Madden-Remers* (see Caskey, Cal. Search & Seizure (2015) § 3:33, p. 386), or some other combination thereof (see *People v. Johnson* (1987) 189 Cal.App.3d 1315, 1320 [referring to *Harvey-Remers*]).  All of these labels refer to the same body of case law, which we describe by its most commonly used name, the *Harvey-Madden* rule or simply *Harvey-Madden*.

justify police activity to a test of reliability)—but the two are distinct. Unlike the exclusionary rule, which is a judge-made remedy aimed at deterring violations of the Fourth Amendment by law enforcement, *Harvey-Madden* is set of state law evidentiary rules governing the manner in which the prosecution may establish grounds for a challenged stop or search.[7]

In its most conventional application, the *Harvey-Madden* rule is, in effect, nothing more than the hearsay rule adapted specifically to motions to suppress. Obviously, when one officer relies on information provided by someone else to justify a stop or search, a hearsay problem arises. "In most cases where the rule has been applied the information furnished the arresting officer has been the product of hearsay evidence and consisted either of (1) a statement by the informing officer asserting as a fact the defendant had committed a particular crime or was at a particular place where subsequently he was arrested, without stating the basis for the assertion [citations]; (2) a statement by the informing officer a lay informer had told him the defendant was guilty of a crime or relating information given by the informer, without identifying the informer, which has been described as information given by a 'phantom informer' [citations]; or (3) a request, through official channels, to arrest the defendant for a particular crime for which no warrant has been issued." (*People v. Poehner* (1971) 16 Cal.App.3d 481, 486–487; see *People v. Gomez* (2004) 117 Cal.App.4th 531, 541 ["*Harvey/Madden* rule merely precludes the prosecution from relying on hearsay information communicated to the

---

[7] See *People v. Collins* (1997) 59 Cal.App.4th 988, 997, fn. 6 (*Collins*) ["[w]hile . . . a challenge to the underlying validity of the warrants [under the exclusionary rule] is legally permissible . . . it is a step beyond the actual challenge that appellant makes in this case. In this case, appellant actually argues the prosecution failed to prove, in accordance with the established evidentiary rules, that there was a facially valid arrest *at all*"]; *People v. Armstrong* (1991) 232 Cal.App.3d 228, 241 (*Armstrong*) ["[i]t is first obvious that, where a search occurs incident to an arrest warrant a reporting officer tells the arresting officer exists, the objective reasonableness of the reporting officer cannot be determined if no evidence he obtained the warrant information he transmits is produced. *Remers, Harvey,* and *Madden* require production of such evidence"].

arresting officer that is not sufficiently specific and fact based to be considered reliable"].)[8]

By the same token, when an officer seeks to justify a warrantless stop or search based on information obtained from an electronic communication, a variation of the same hearsay problem arises. Although *Harvey-Madden* evolved in the context of information transmitted to officers in the field by telephone or radio (see, e.g., *In re Richard G.* (2009) 173 Cal.App.4th 1252), the rule has been applied to various types of electronic communication. (See *People v. Alcorn* (1993) 15 Cal.App.4th 652, 660 (*Alcorn*) [where officer reviewed computer generated abstract of arrest warrant, court notes "[i]n today's age of electronic communications and computerized record-keeping, the use and reliance on abstracts are a necessary part of the administration of justice"]; *Miranda v. Superior Court* (1993) 13 Cal.App.4th 1628, 1630 (*Miranda*) [officer ran computer check and reviewed her " 'probation book' " to confirm defendant's probationary status].) Our Supreme Court has recognized that the use of electronic database information in modern law enforcement presents hearsay issues, and has provided clear guidance on how to address them. Under Evidence Code section 1280, the official records exception to the hearsay rule, a properly authenticated printout from a law enforcement database is admissible in criminal proceedings. (*People v. Martinez* (2000) 22 Cal.4th 106, 126, 134). But unless offered in admissible form, the information residing in a computer database is still hearsay, often multilevel hearsay. (See 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2015) Official Records and Writings, § 5.5, p. 5–4

---

[8] As noted in *Gomez*, "the hearsay involved in the *Harvey/Madden* rule is not affected by the Supreme Court's . . . decision in *Crawford v. Washington* (2004) 541 U.S. 36. . . . [T]he issue in *Crawford* involved the admissibility of 'testimonial hearsay' at the defendant's trial in violation of his Sixth Amendment right to confront his accusers. (*Crawford v. Washington, supra,* 541 U.S. at p. 53 ['testimonial hearsay' includes 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations'].) The testimony [at the suppression hearing in this case] did not implicate this right. Consequently, *Crawford* does not apply." (*Gomez, supra*, 117 Cal.App.4th at pp. 541–542; see *People v. Navarro* (2006) 138 Cal.App.4th 146, 161, fn. 10.)

["Most computer output is hearsay because it reflects information assembled and entered into the computer by human operators."].)

The People do not seriously question that the use of an electronic database may be considered an "official channel" of communication under the *Harvey-Madden* rule, but they do question *Harvey-Madden*'s continued vitality for other reasons. They point out that, under Article I, section 28, subdivision (f) of the California Constitution, popularly known as Proposition 8, " ' "federal constitutional standards govern issues related to suppression of evidence by the police." ' " (*People v. Lazlo* (2012) 206 Cal.App.4th 1063, 1069; see *In re Lance W.* (1985) 37 Cal.3d 873, 879, 890, 896 [Proposition 8 bars exclusion of relevant evidence in criminal proceedings only if exclusion is required by the Fourth Amendment exclusionary rule as defined by the United States Supreme Court].) From this premise, they argue that the *Harvey-Madden* rule was effectively overruled by *Herring v. United States* (2009) 555 U.S. 135 (*Herring*) insofar as it might be applied to police action predicated on a law enforcement computer database. So long as the police act "in objectively reasonable reliance" on information obtained in good faith from such a database, the Supreme Court held in *Herring*, even if the information turns out to be erroneous—as it did in that case—exclusion is not warranted. (*Id.* at pp. 145–146.) The argument that *Harvey-Madden* is a dead letter runs contrary to our Supreme Court's recognition of its continuing viability in *Brown*, *supra*, 61 Cal.4th 968, but in any event, *Herring* has no applicability here. There is no question presented in this case of good faith reliance on inaccurate information, from the ARIES database or elsewhere. The issue, instead, is whether Officer Miller had *sufficient* information to act without a warrant. [9] As we explain below, that presents a threshold evidence question, which we resolve under well-established hearsay principles. [10]

_____

[9] See *Collins*, *supra*, 59 Cal.App.4th 988 and *Armstrong, supra,* 232 Cal.App.3d 228, cited in footnote 7 *ante*, both drawing the distinction between the ultimate question of admissibility under the exclusionary rule and the antecedent question of evidentiary sufficiency. Notably, both *Collins* and *Armstrong* considered the continuing viability of *Harvey-Madden* rule in light of the good faith exception to the warrant requirement under *United States v. Leon* (1984) 468 U.S. 897 (*Leon)*, and concluded the *Harvey-Madden*

B.     Application of the *Harvey-Madden* Rule

Appellant argues that the evidence relied upon by the People to prove Officer Miller's advance knowledge of Mills's and Bolstad's probationary status—specifically, the references in his testimony to information obtained from the ARIES database—was hearsay.  " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  The reasons for excluding hearsay—the same reasons undergirding the *Harvey-Madden* rule—are that out-of-court statements are not made under oath, the defendant has no opportunity to cross-examine the person who made them, and the trier of fact cannot observe the demeanor of the person making them.  "Except as provided by law, hearsay evidence is inadmissible."  (Evid. Code, § 1200, subd. (b).)

In response, the People suggest that Officer Miller's testimony about having obtained information from the ARIES database was admissible because information in the database would have been admissible as a public record, but that is incorrect.  While a printout from the database would have been admissible as an "official record," if properly authenticated, Officer Miller's testimony about his reliance on the database was admissible only if some other hearsay exception applied.  "[A] hearsay objection cannot be eliminated by eliciting the content of the statement in an indirect form." (2 McCormick On Evidence (7th ed. 2013) § 249, at pp. 196–197; see *id.*at p. 197 ["testimony regarding 'information received' by the witness and the results of investigations made by other persons are properly classified as hearsay"].)  The pertinent

remains good law and was not abrogated by *Leon*.  (*Collins,* at pp. 996–997; *Armstrong*, at pp. 235–241 [*Leon* did not eliminate *Harvey-Madden* rule]; see *Alcorn*, *supra*, 15 Cal.App.4th at pp. 656–660 [after *Leon*, abstract of arrest warrant, in lieu of actual warrant, is sufficient to discharge prosecution's duty]; *Miranda*, *supra*, 13 Cal.App.4th at p. 1634 [same].)  We perceive no basis to come to a different conclusion in light of *Herring*.

[10] To the extent Proposition 8 is relevant here, the proviso in Article I, section 28, subdivision (f)(2) expressly preserves specified  "statutory rule[s] of evidence" under California law, including the hearsay rule.

15

hearsay exception here is Evidence Code section 1250, subdivision (a)(1), the state-of-mind exception. Under that exception, Officer Miller's testimony that he obtained information from the database was admissible to prove his receipt of information from an independent source. (See *People v. King* (1956) 140 Cal.App.2d 1, 5 [hearsay admissible to prove an officer's state of mind when the legality of police conduct is in issue].)[11]

So long as Officer Miller's testimony had sufficient indicia of reliability, it was admissible. There is, of course, always a backstop test for trustworthiness as a prerequisite to limited purpose admission of hearsay under Evidence Code section 1252, subdivision (a)(1). (See Evid. Code, § 1252.) "The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1251 [interpreting Evid. Code, § 1230].) A reviewing court may overturn the trial court's finding regarding trustworthiness only if there was an abuse of discretion. (*Id.* at pp. 1250–1251; *People v. Edwards* (1991) 54 Cal.3d 787, 819–820; *People v. Frierson* (1991) 53 Cal.3d 730, 745.) Giving the magistrate's evidentiary ruling appropriate deference under this standard, we conclude that Officer Miller's testimony concerning his use of the ARIES database may have been hearsay, but it was admissible for a limited non-hearsay purpose under Evidence Code section 1250, subdivision (a)(1). The magistrate did not explain her ruling in these terms, but she did not need to do so. And we are bound by her implied findings. (§ 1538.5, subd. (i); e.g., *People v. Magee* (2011) 194 Cal.App.4th 178, 182–183.)

---

[11] To the extent the "fact" of Mills's and Bolstad's probationary status came from ARIES, it was double hearsay, since someone other than Officer Miller recorded it in the database at an unknown date and time, and Officer Miller retrieved it at a later date. Wherever multilevel hearsay is offered, each level of hearsay must satisfy a recognized hearsay exception if it is to be eligible for admission into evidence. (Evid. Code, § 1201; see *People v. Ayers* (2005) 125 Cal.App.4th 988, 994–995). Evidence Code section 1250, subdivision (a)(1) applies at this second hearsay level as well.

Officer Miller was the lead investigating officer, and he testified to his considerable experience using ARIES. It would have been perfectly logical for an experienced officer to conclude that, since the information he obtained from a database he used routinely about two reported probationers was consistent with his prior knowledge of those two people, his decision to carry out a probation search in reliance on what he saw in the database was solidly grounded and current.[12] As we read the record, that is essentially what Officer Miller's testimony was, and the magistrate credited it. The question whether Officer Miller "knew" Mills and Bolstad were on probation and subject to search is one of pure historical fact to which we defer since it is supported by substantial evidence. (Cf. *People v. Downey* (2011) 198 Cal.App.4th 652, 658 [whether police "reasonably believed" probationer lived at the address searched is a question of fact reviewed deferentially]; *People v. Tidalgo* (1981) 123 Cal.App.3d 301, 306 [same]; *People v. Palmquist* (1981) 123 Cal.App.3d 1, 11–12 [same], disapproved on another point by *People v. Williams* (1999) 20 Cal.4th 119, 135.)

Appellant urges us to disregard Officer Miller's testimony that he had personal knowledge of Mills's and Bolstad's probation status. He relies primarily on *Collins*, *supra*, 59 Cal App.4th 988, where the Court of Appeal upheld a *Harvey-Madden* challenge because the arresting officer claimed to have relied in good faith on the existence of an arrest warrant which was never proved up (it could not have been proved up because the officer's understanding was mistaken and the warrant was for someone else). Appellant seeks to bring this case within the *Collins* holding by inviting us to take the view that the true and only source of Officer Miller's claimed "personal knowledge"

---

[12] Cf. *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1074 [construing section 872, subdivision (b), which permits admission of hearsay testimony by an investigating officer for purposes of establishing probable cause in a preliminary hearing, to permit only "officers with lengthy experience or special training to testify" in order to ensure the "testifying officer will be capable of using his or her experience and expertise to assess the circumstances under which the statement is made and to accurately describe those circumstances to the magistrate so as to increase the reliability of the underlying evidence"].

was the ARIES database.  This, we cannot do.  We consider the record in the light most favorable to the People, the prevailing party below, since " 'all factual conflicts must be resolved in the manner most favorable to the [superior] court's disposition on the [suppression] motion.' " (*Woods*, *supra,* 21 Cal.4th at p. 673.)

The magistrate was charged with the responsibility of evaluating Officer Miller's credibility.  As we read the record, the magistrate impliedly found that Officer Miller's "personal knowledge" was not derived solely from the database.  Instead, the magistrate evidently was convinced Miller's "personal knowledge" was in part due to his pre-existing familiarity with the probationers, and we are bound by her implied finding that he had a reliable second source of information.  (*Martinez*, *supra*, 22 Cal.4th at p. 120 [trial court's ruling on admissibility " 'implies whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary' "]; see Evid. Code, § 402, subd. (c).)  Determining whether Officer Miller truly had sufficient knowledge to confirm the reliability of the database information on which he relied was a preliminary fact committed to her discretion.  (See Evid. Code, § 403, subd. (a) (2); 1 Jefferson, Cal. Evidence Benchbook, *supra*, Determining Preliminary Facts Under Evidence Code § 403: Relevancy, Personal Knowledge, Identity, and Authenticity, § 25.11, p. 25–8 ["Proof of the preliminary fact of a witness's personal knowledge may be made by any otherwise admissible evidence, including the witness's own testimony."]; see *People v. Tafoya* (2007) 42 Cal.4th 147, 165 [trial court rulings on "sufficiency of the foundational evidence" reviewed under abuse of discretion standard].)  Given absence of detail concerning Officer Miller's pre-existing familiarity with Mills and Bolstadt, the evidence of corroborating information bolstering his reliance on ARIES is slight, but there is enough to survive substantial evidence review of what was, at bottom, a discretionary evidence ruling.

C.      Reasonableness of Officer Miller's Grounds for Search

The admissibility of Officer Miller's testimony, however, does not end the analysis.  Although Officer Miller's subjective belief that Mills and Bolstad were probationers subject to search was a matter of historical fact for the magistrate as finder

18

of fact, the further question whether, under the Fourth Amendment, Officer Miller's basis for executing a warrantless search was *reasonable* in light of the total mix of information known to him, requires "critical consideration, in a factual context, of legal principles and their underlying values" (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888), thus presenting a mixed question of law and fact, reviewable de novo. (*People v. Ault* (2004) 33 Cal.4th 1250, 1264, fn. 8; see *Ornelas*, *supra*, 517 U.S. at p. 699; *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384; *Lawler*, *supra*, 9 Cal.3d at p. 160.)

In a series of probation and parole search cases in recent decades, starting with *Bravo, supra,* 43 Cal.3d 600, in 1987, our Supreme Court has enunciated a set of principles that guide our analysis of this question. We distill those principles down to four. First, as noted above, and most fundamentally, " 'whether a search is reasonable must be determined based upon the circumstances *known to the officer when the search is conducted.*' " (*Jaime P.*, *supra*, 40 Cal.4th at p. 133, quoting *Sanders*, *supra*, 31 Cal.4th at pp. 332, 334.) That principle applies to both adult and juvenile probation searches (*Jaime P.*, *supra,* at pp. 132–133) as well as to parole searches (*Sanders*, *supra,* at p. 332).

Second, the rationale for warrantless probation searches is consent-based. " '[W]hen [a] defendant in order to obtain probation specifically [agrees] to permit at any time a warrantless search of his person, car and house, he voluntarily [waives] whatever claim of privacy he might otherwise have had.' " (*Bravo*, *supra*, 43 Cal.3d at p. 607.) The consent is a "complete waiver of [the defendant's] Fourth Amendment rights, save only his right to object to harassment or searches conducted in an unreasonable manner." (*Ibid.*)

Third, because probation searches are undertaken to " 'deter further offenses by the probationer and to ascertain whether he is complying with the terms of probation' " (*Bravo*, *supra*, 43 Cal.3d at p. 610), the scope of permitted search must be "reasonably related to the purposes of probation." (*Robles*, *supra*, 23 Cal.4th at p. 797.) And fourth, "whether the purpose of the search is to monitor the probationer or to serve some other law enforcement purpose, or both, the search in any case remains limited in scope to the

19

terms articulated in the search clause." (*Woods, supra*, 21 Cal.4th at p. 681.) Unlike the parole context, where the scope of permissible search is imposed by law[13]—and deemed known to the searching officer from nothing more than the fact that someone is on parole—a probationer's expectation of privacy, and hence the reasonableness of a warrantless search, may vary depending on the scope of advance consent. And in determining the scope of consent, we must use an objective test, evaluating the terms of the operative search clause in objective terms, without regard to either the subjective understanding the probationer might have (*Bravo, supra*, at pp. 606–607) or the searching officer's subjective intent in conducting the search (*Woods, supra*, at p. 680).

In each of the four leading California Supreme Court probation search cases, *Bravo*, *Woods*, *Robles* and *Jaime P.*, there was evidence that the probation conditions at issue expressly permitted or contemplated the warrantless search of a residence. (*Jaime P., supra*, 40 Cal.4th at p. 132 [probationer agreed to "submit his person and property, including his vehicle and residence, to a warrantless search"]; *Woods, supra*, 21 Cal.4th at p. 681 [probationer agreed to "submit her residence to warrantless searches"]; *Robles, supra*, 23 Cal.4th at p. 796 [probationer agreed to "warrantless searches of his 'property, including any residence premise[s]' "]; *Bravo, supra*, 43 Cal.3d at pp. 602–603, fn. 1 [probationer agreed to "[m]aintain [his] residence as approved by probation officer" and "[s]ubmit his person and property to search or seizure at any time of the day or night"].) Here, by contrast, there is nothing in the record to aid an objective evaluation of the scope of advance consent that was given. We do not know whether the authorized scope of search extended just to the persons of Mills and Bolstad, or to all property under their control as well; and if it did extend to their property, we do not know whether it extended specifically to their residence. Nor do we know whether a search was authorized for any

---

[13] Section 3067, subdivision (b)(3); see *People v. Schmitz, supra*, 55 Cal.4th at p. 916. Upon release from prison, all parolees are notified that "[y]ou and your residence and any property under your control may be searched without a warrant at any time by any agent of the Department of Corrections [and Rehabilitation] or any law enforcement officer." (Cal.Code Regs., tit. 15, § 2511, subd. (b)(4).)

particular kind of contraband.[14] Even if we were inclined to draw an inference from Officer Miller's testimony that he likely knew the terms of the governing probation orders—thus supporting an implied finding on this point in light of the fact he checked the ARIES database—we would need some form of objective proof from which such an inference, logically, could be drawn. His subjective belief is not enough.

The omission of any particulars concerning the authorized scope of the search is not a minor detail. Unlike parole searches—where a searching officer's knowledge of a person's parole status *alone* is enough to justify a search of the parolee's person or any property under his control, including his residence—the permissible scope of a probation search is circumscribed by the terms of the search clause, and the scope may vary. Conditions of probation may be imposed so long as they are "fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer." (§ 1203.1, subd. (j).) Courts therefore attempt to individualize the terms and conditions of probation to fit the offender. (See *People v. Lent* (1975) 15 Cal.3d 481, 486; *People v. Contreras* (2015) 237 Cal.App.4th 868, 878.) A search condition is not mandated by statute for every probationer, and probation search clauses are not worded uniformly. (See *United States v. King* (9th Cir. 2013) 736 F.3d 805, 811 & fn. 1 (dis. opn. of Berzon, J.).) On occasion, judges may limit the scope of the defendant's consent to searches for particular contraband, such as drugs or stolen property, or place spatial limits on where searches may take place. Some judges have "standard" probation terms for particular crimes and particular circumstances (and if so, those terms may be subject to proof by judicial notice, which was not sought here), but practices vary by county all over the state.

---

[14] In a footnote to their brief opposing Appellant's renewed motion to suppress filed with the superior court, the People list the docket numbers of the criminal proceedings in which the probation orders applicable for Mills and Bolstad purportedly were entered, but that brief says nothing about the search condition applying to their residence. Nor was any request for judicial notice ever made, in the trial court or on appeal.

21

On the record presented here, it is impossible to tell what limits may have been imposed on any probation search of Mills and Bolstad. Because *Bravo* rests on the idea that "knowledge of a probation condition is what informs police about the limits of their authority to conduct warrantless searches" (*Hoeninghaus*, *supra*, 120 Cal.App.4th at p. 1196), mere knowledge that someone is on probation and subject to search, without more, may be insufficient where there is a challenge to the search. In fact, because "judges who may be called upon to determine the lawfulness of a search[] must be able to determine the scope of the condition by reference to the probation order" (*Bravo*, *supra*, 43 Cal.3d at p. 606), proof of the written probation terms is arguably *required* whenever the prosecution is called upon to justify a warrantless probation search. But while presenting the probation order itself may be the better practice, we do not view it as mandatory. The only court of appeal to have addressed this precise issue took the same view. (See *Rios*, *supra*, 193 Cal.App.4th 584, 597 ["we do not read [*Bravo*] as requiring the People to prove the scope and precise terms of a probation condition before a warrantless entry pursuant to such a condition can be found lawful"]; see also *Armstrong*, *supra*, 232 Cal.App.3d at p. 245 ["Proof that the warrant information precipitating the arrest was not manufactured [in violation of *Harvey-Madden*] may be made by circumstantial evidence other than the warrant or a certified copy."].) Here, by unambiguously asserting a *Harvey-Madden* objection in its written motion to suppress, the defense gave plenty of notice that it intended to challenge the evidentiary foundation for the warrantless search in this case, and in response to that objection, the prosecutor might have proved up the operative terms of probation in any number of ways. The bottom line, however, is that the limited evidentiary presentation the prosecutor chose to make leaves us with no objective grounds upon which to rely in evaluating whether the permitted scope of search was exceeded.

The People seek to shore up their position by contending it was unnecessary to prove advance knowledge beyond Officer Miller's belief that Mills and Bolstad were on probation and subject to search. For that proposition, they rely on *Rios*, *supra*, 193 Cal.App.4th 584, a case involving the warrantless search of a juvenile probationer's

residence by members of a police unit assigned to monitor high risk juveniles. *Rios* is worth considering in some depth because, by comparison, it illustrates what is missing from the record in this case. There, both the probationer, R.R., and his residence were known to the officers because, during a recent prior visit to that house, they found R.R. inside, under the influence of methamphetamine. They also found drug paraphernalia and gang tagging in the house. (*Id.* at p. 589.) Upon returning to check on R.R. a couple of months later, the officers encountered Rios inside the house and recognized gang tattoos on his arms. He was wearing unusually heavy clothing for a hot summer day, and he behaved in a belligerent manner toward them. (*Id.* at p. 589.) When the officers sought to detain Rios for questioning, he resisted. A struggle ensued; a gun fell from his clothing; and a search of his person yielded a switchblade. (*Id.* at p. 590.) Rios eventually pleaded no contest to resisting arrest and various weapons possession charges, and was sentenced to a three-strikes term of life imprisonment. (*Id.* at p. 588.)

On appeal, Rios did not challenge the officers' warrantless entry into R.R.'s residence, that issue having been waived in the trial court. The lawfulness of the officers' warrantless entry did arise obliquely, however, in the context of an ineffective assistance claim on which he had the burden of proof. He failed to meet that burden. Rios argued that his counsel had been ineffective for not moving to suppress based on the prosecution's failure to prove the "exact terms" of R.R.'s probation order. (*Rios, supra,* 193 Cal.App.4th at p. 595.) The court rejected that argument, but did so on a record, unlike the one we have, where the prosecution proved up the operative probation conditions in some detail and connected them specifically to the purposes of the officers' followup probation supervision visit to R.R.'s residence. The lead officer testified that, prior to his team's followup visit, he knew that the probationer's sentencing judge had imposed " 'every [probation] term and condition possible . . . , a furlough program similar to being on parole, so you have drug orders, orders not to associate with gang members, stolen property, weapons, spray marking . . . devices,' " including " 'search terms' " for the items the probationer was barred from possessing. (*Id.* at p. 596.) Thus, in *Rios*, in light of the investigating officers' recent visit to R.R.'s residence, and their

23

duty to monitor compliance with specific, known terms of R.R.'s probation, there were objectively reasonable grounds to conduct a warrantless residential search for drugs, stolen property, or evidence of gang activity inside the house. We have nothing like that in this case. Officer Miller testified to his general familiarity with Mills and Bolstad and to having had unexplained prior contact with them, but beyond that there is nothing. Nor can the People fall back on a burden of proof argument, for in this case they have the burden.

Although the *Rios* court did not place much weight on the fact that the rights of a non-probationer guest were involved—understandably, because the record there amply justified warrantless entry to R.R.'s residence, and once the officers were properly inside, the arrest and search of Rios was plainly justified by his conduct—we think the involvement of a non-probationer is important here. The rationale for probation searches embraced by the California Supreme Court in *Bravo* and its progeny is essentially transactional. The probationer is deemed to have consensually surrendered his expectations of privacy as a quid pro quo for avoiding imprisonment. Although this theory of consent does extend constructively to house guests in some circumstances— based on sharing of common areas in the residence (*Woods*, *supra*, 21 Cal.4th at pp. 675– 676)—the basis for the theory is more attenuated for guests than it is for their probationer hosts. Guests are therefore entitled to demand adherence to the proper scope of their host's search conditions, despite the usual rule prohibiting the assertion of someone else's Fourth Amendment rights in search and seizure cases. (See *Rakas v. Illinois* (1978) 439 U.S. 128.) The California Supreme Court took care to underscore this point in *Woods*, *supra*, 21 Cal.4th 668, where, in the course of upholding the probation search of a residence that yielded incriminating evidence against two non-probationer guests, the court emphasized that "our holding is not intended to legitimize unreasonable searches with respect to nonprobationers who share residences with probationers. In all cases, *a search pursuant to a probation search clause may not exceed the scope of the particular clause relied upon*." (*Id.* at pp. 681–682, italics added.)

24

The court expanded on the same theme in *Robles*, *supra*, 23 Cal.4th 789. "[R]esidences frequently are occupied by several people living together, including immediate family members and perhaps other relatives or friends, as well as guests. Allowing the People to validate a warrantless residential search, after the fact, by means of showing a sufficient connection between the residence and any one of a number of occupants who happens to be subject to a search clause, would encourage the police to engage in facially invalid searches with increased odds that a justification could be found later. It also would create a significant potential for abuse since the police, in effect, would be conducting searches with no perceived boundaries, limitations, or justification." (*Id.* at p. 800.) "The potential for abuse, with its consequent impact on the citizenry," the court explained, "is especially heightened in high crime areas where police might suspect probationers to live." (*Ibid.*) "With respect to the goals of probation, society would be hard pressed not to ' " 'recognize as legitimate' " ' [citation] third party privacy expectations concerning the illegality of warrantless searches that bear no reasonable relation to the purposes of probation." (*Id.* at p. 799.) Permitting arbitrary and indiscriminate probation searches might cause "[m]any law-abiding citizens . . . not to open their homes to probationers if doing so were to result in the validation of arbitrary police action. If increased numbers of probationers were not welcome in homes with supportive environments, higher recidivism rates and a corresponding decrease in public safety may be expected, both of which would detract from the 'optimum successful functioning' of the probation system." (*Ibid.*)

We conclude that, on this record, the search of 628 Walnut Avenue cannot be upheld. We are asked to sustain the warrantless search of a residence without any showing that the searching officers knew that the target of their search, the residence itself, fell within the scope of a probation search clause. A probation search carried out by police heedless of any limits in the operative search clause might turn out to be lawful or unlawful—depending on an after-the-fact check. (See *Hoeninghaus*, *supra*, 120 Cal.App.4th at p. 1196 ["If, as the People argue, police did not need to know that their authority to search defendant was limited to searching for drugs, then police could search

25

him without any limitation and without any grounds to believe the search was reasonable; and if, after learning about the condition, they claimed that they were looking for drugs, the search could be upheld under the consent exception"].)  This is the "search first, justify later" approach that the Supreme Court has consistently decried, while pointing out that it is particularly problematic where third-party non-probationers are involved.

To meet their burden of proof, the People were required to present evidence demonstrating the objective reasonableness of a warrantless search.  The presentation of a search clause expressly allowing a residential search would have sufficed, as would more detailed testimony from Officer Miller showing some understanding of the operative terms of probation and connecting those terms to the need for a warrantless search.  Even without any of that, the search might still have been justified if the objective circumstances otherwise warranted it.  (See *Woods*, *supra*, 21 Cal.4th at p. 680 [" ' "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action" ' "], quoting *Whren v. U.S.* (1996) 517 U.S. 806, 813.)  But we find no such justification on this record.

## DISPOSITION

We reverse the order denying Appellant's motion to suppress.  Because the People do not dispute that the order denying Appellant's section 995 motion rises or falls with the order denying the suppression motion, we also reverse the order denying the section 995 motion.  The case is remanded with directions to vacate the judgment of conviction.

26

_____
Streeter, J.

We concur:


_____
Reardon, Acting P.J.


_____
Rivera, J.


A140146/*People v. Romeo*

27

*People v. Romeo* (A140146)


Trial Court:                                                  Contra Costa County Superior Court


Trial Judges:                                            Hon. John Laettner;
Hon. Susanne M. Fenstermacher


Counsel for Defendant and Appellant:     Donn Ginoza, by appointment of
the Court of Appeal under the First District
Appellate Project's Independent-Case System


Counsel for Plaintiff and Respondent:   Kamala D. Harris
Attorney General of California

Gerald A. Engler
Senior Assistant Attorney General

Jeffrey M. Laurence
Supervising Deputy Attorney General

Na'Shaun Neal
Deputy Attorney General