Filed 1/4/21  P. v. White CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B295147 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA444963) |
| v. | |
| ALEX WHITE et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charlaine Olmedo, Judge. Affirmed.

John A. Colucci, under appointment by the Court of Appeal for Defendant and Appellant Alex White.

The Justice Firm and Joe Virgilio for Defendant and Appellant Darron Williams.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Alex White and Darron Williams appeal from their convictions of two counts of first degree murder, one count of attempted murder, and one count of discharge of a firearm from a motor vehicle. White argues the trial court erred in denying his motions to suppress evidence of a traffic stop made a few days before the shooting as well as statements he made to the police when later arrested. He also argues the trial court abused its discretion in admitting a photo of him posing with a gun. We find no error.

Williams raises one argument on appeal: his murder convictions must be vacated under Senate Bill No. 1437 (SB 1437), the newly amended felony murder law. Recently, our Supreme Court in *People v. Gentile* (Dec. 17, 2020, S256698) __ Cal.5th __ [2020 WL 7393491], upheld the rule announced in earlier Court of Appeal decisions that relief under SB 1437 cannot be sought on direct appeal. Instead, resentencing must first be brought in the trial court by way of a petition under Penal Code section 1170.95.[1] We also affirm Williams's judgment of conviction.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 13, 2015, at approximately 3:20 p.m., B.B. was standing in the yard of his mother's house with his brother and three friends. B.B. heard what he thought were firecrackers and looked up to see a white SUV with two guns jutting out the passenger-side windows. Around 20 rounds were fired: his friends H.O. and P.K. were hit and died of their injuries. B.B.

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

was not shot but did go to the hospital for a knee injury from diving into the gutter.

At the same time, a crossing guard was working at a school up the street from B.B.'s house. She heard gunshots and saw a white SUV driving rapidly in her direction before making a right turn at the intersection. She identified the SUV in a photograph detectives provided, and said she saw three young African-American occupants of the car.

Three weeks after the shooting, detectives arrested White and interviewed him in a recorded session. White admitted he was in the vehicle during the shooting. He told the detectives that Williams was the driver, and there were one or two other passengers. White acknowledged he was a member of the 4-8 Gangster Crip gang, and said the shooting happened in rival gang territory. He claimed he was only catching a ride that day, and did not participate in the shooting.

White and Williams were charged with the first degree murder of H.O. (§ 187, subd. (a)), the first degree murder of P.K. (§ 187, subd. (a)), the attempted murder of B.B (§§ 664/187), and discharge of a firearm from a motor vehicle (§ 26100, subd. (c)). The information alleged firearm enhancements (§ 12022.53), gang enhancements (§ 186.22, subd. (b)(1)(C)), and special circumstances as to the murder counts (§§ 190.2, subd. (a)(3) [multiple murder] & 190.2, subd. (a)(21) [drive-by murder]).

White and Williams were jointly tried with separate juries. At trial, White's incriminating statements to the police were admitted into evidence. The prosecution also presented Williams's cell phone records showing he was in the vicinity of the crime scene when the shooting occurred, and surveillance footage showing a white SUV that appeared to be a Chevy

3

Traverse traveling on the street where the shooting took place. A firearms expert testified that 14 bullet casings were recovered from the scene, fired from three guns.

The prosecution also presented evidence of two events that occurred prior to the shooting. First, in 2007, Williams was convicted of a drive-by shooting less than two blocks from the present crime scene. Second, 11 days before the present shooting, Officer Bryan Schilling had pulled over a white Chevy Traverse SUV driven by Williams. White also was in the vehicle along with three other passengers. Everyone in the SUV was a member of the 4-8 Gangster Crips. Officer Schilling had cited Williams for a license plate violation and White (and others) for a seat belt violation. Officer Schilling noticed that Williams was disabled and the vehicle was equipped with levers to allow him to operate the controls with his hands.

A gang expert testified that Williams and White were 4-8 Gangster Crip members. A photo was introduced of White, Williams, and others displaying gang signs; White had a pistol tucked in his waistband. Given a hypothetical mirroring the facts of the case, the expert opined the shooting was committed for the benefit of, and in association with, the gang.

White's attorney called K.V., the mother of victim B.B., to testify. She had been sitting on her front porch when the shooting happened. In testimony that appeared unexpected, she identified White as the shooter.[2] The prosecutor asked K.V. "how certain" she was that White "was the one who did the shooting"?

---

[2] White's counsel told the court, "Her testimony is a complete surprise to me."

4

K.V. answered, "I'm certain."  She knew White and his family from the neighborhood.  She could not identify the driver.

The juries convicted White and Williams on all counts.  The court sentenced White to life without possibility of parole on the two murder counts (one of which was stayed) and concurrent terms of 25 years to life (attempted murder) and 15 years to life (discharge of a firearm from a motor vehicle), plus a 10-year gang enhancement.  Other enhancements were stayed.  Williams was sentenced to two consecutive sentences of life without the possibility of parole plus 39 years to life.  Defendants timely appealed.

## *DISCUSSION*

## I.

## Defendant White's Appeal

White argues the trial court erred in denying his motions to suppress evidence of a traffic stop made prior to the shooting as well as statements he made to the police after he was arrested.  He also argues the trial court abused its discretion in admitting a photo of him posing with a gun.

### A.  *The Motion to Suppress Evidence of the Traffic Stop*

White contends the trial court erred in admitting evidence of a traffic stop that occurred several days prior to the shooting.  We report the circumstances of the detention in detail in order to address White's arguments that (1) there was insufficient evidence of a violation of the Vehicle Code to justify a traffic stop; and (2) the officers admitted that the detention was really to investigate defendants' gang association.

### 1) *The Traffic Stop*

On April 2, 2015, 11 days *prior* to the shooting, Officers Schilling and Garcia were "working gangs" and patrolling the neighborhood on "Hood Day," a celebration by a local gang. Throughout the day, the officers observed a gathering of gang members. At 11:06 p.m., the officers were in their car, idling on the side of the road when Williams drove past them going in the opposite direction. The officers' car did a U-turn and pulled Williams over. A video camera in the police car was activated and connected with microphones in Officers Schilling's and Garcia's belts to record the subsequent events.

Officers Schilling and Garcia exited their car and approached Williams's car. White was a passenger, as were three other men, including Devonte Parker. Williams rolled down his window and asked, "How come I got pulled over?" Officer Schilling responded, "The old license plate light." Officer Garcia asked for ID:

"[Officer Garcia]: You got your ID on you? Anybody in the back got ID on them? Yes? No? Maybe so? . . . . I'm being calm as fuck with you guys right now. All right? We can either do it just chill, or we can do it all with all the bullshit. . . .

"[Officer Schilling]: Hey, Louis, get the three in the back's ID. They're all gonna get fucken cited up.

"[¶] . . . [¶]

"[Officer Garcia]: . . . Well, the guy -- the -- they -- this guy in the middle he has ID. The other two guys or everyone else is playing, fucken, like assholes. We're just gonna fucken pull everybody out one at a time."

Officer Schilling made a call to other officers for assistance. Two additional officers arrived. Each of the four officers took one

passenger out of the car.  Officer Schilling asked another officer about Williams:  "See the guy in the wheelchair?" An unidentified officer responded, "[Officer] Fernie said he seemed nervous, dude, like shaking."  The sound of laughter followed this remark.

As Officer Garcia questioned a passenger about his tattoos and gang affiliations, the passenger protested: "You're making it hard for us, man.  We just trying to get home."   Officer Garcia responded:

"[Officer Garcia]:  Man, we cut you guys so much fucken slack today. . . .  You saw me fucken circle that motherfucker like four, five, man, like 10 times.

"[Passenger]:  Well, we outta there though.

"[Officer Garcia]:  I didn't do shit.  Well, obviously, we're gonna contact you eventually, right?

"[Passenger]:  (unintelligible sound)

"[Officer Garcia]:  We let you -- we let you have your party.  We let you have your party, right?

"[Passenger]:  Right.

"[Officer Garcia]:  And so you gotta let us do our thing.

"[Passenger]:  That's what we doing though.  Like, ya'll see we outta there.  Y'all could've been going –

"[Officer Garcia]:  You gotta let us do our thing.  We – we let you guys go for a long time."

"[Officer Schilling]:  Yeah, that is bad.

"[Parker]:  Well, I gave you my name, Officer.

"[Officer Schilling]:  You been arrested? . . .

"[Parker]:  Yes, I have before.

"[Officer Schilling]:  Okay.  So you have?  Here, man, turn around.  Put your . . . hands behind your back. . . .  Now, you're going to have to get him to come off, because, otherwise, I'm

7

gonna take you to the station. . . . Face the wall. . . . I'm gonna find you now. We're gonna stay out here all night, man. . . . And if I find you under some other name – . . . I'm gonna book you on an open. . . . Right now if I find you, I'll take you – I'll take you down and I'll get you fingerprinted."

After finding Parker in the police database under a different spelling than what Parker had given, Officer Schilling asked Parker about his gang affiliation and his activities that day.

When the officers' questioning had continued for about 40 minutes, Officer Schilling asked Officer Garcia, "Want to cite him? . . . Are you gonna cite him?"

"[Officer Garcia]: Yeah.

"[Officer Schilling]: All three of them?

"[Officer Garcia]: Yeah."

Each of the four officers wrote out a ticket. Officer Schilling also continued to question Parker, asking him about a prior conviction, his tattoos, and whether he was able to outrun a police dog. Finally, Officer Schilling told Parker, "All right, man. I'm done clowning you for today. It was too easy." Another passenger asked Officer Schilling, "We the only car y'all pull over tonight?"

"[Officer Schilling]: No.

"[Unidentified Officer]: No.

"[Officer Schilling]: They're been about – a lot more.

"[Unidentified Officer]: We had – we had a good –

"[Unidentified Male]: I'm talking about out of – I'm talking about from where y'all came from . . . to where – to where we came from.

8

"[Officer Schilling]:  Man, I was there all day.  Didn't you see me drive up and down that street all day?

"[Unidentified Male]:  Y'all was waiting just to – y'all probably. . . .

"[Unidentified Male]:  Man.

"[Officer Schilling]:  He's all, duh. . . .

"[Unidentified Male]:  But why y'all can't . . . .

"[Officer Schilling]:  Well, tomorrow, of course, we're gonna come . . . .  Fortunately, I'll see you guys tomorrow.  We'll try it again tomorrow and see if it goes all day tomorrow."

The officers issued Williams a traffic ticket for a violation of Vehicle Code section 24601 (license plate light), and three tickets to the backseat passengers for violating Vehicle Code section 27315 (not wearing a seat belt).  Fifty-four minutes had elapsed since the officers pulled Williams over.

The prosecution opposed the motion, arguing that Officer Schilling had an "objectively reasonable belief that [Williams's] burned-out license plate lamp violated" the Vehicle Code.  The prosecution also argued that the detention was not prolonged "in any meaningful way" because ten minutes before the end of the stop, one officer indicated he was still "writing" out a ticket for passenger Parker.

### 2)    *The Hearing*

At the hearing on the motion to suppress, the prosecution submitted the dashcam video into evidence.  The video showed that the license plate had lights located on the right and left sides, and that the left-side light was not functioning.  Officer Schilling testified he stopped Williams's car on the date in question because "one of the license plate lights was not

working," and he knew this was a violation of Vehicle Code section 24601 (section 24601).

Section 24601 provides that "Either the taillamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear license plate during darkness and render it clearly legible from a distance of 50 feet to the rear. When the rear license plate is illuminated by a lamp other than a required taillamp, the two lamps shall be turned on or off only by the same control switch at all times."[3]

Officer Schilling acknowledged the stop lasted 54 minutes, but said "as soon as we cited everybody, they were free to go. As soon as we found Mr. Parker in the computer, everybody was free to leave at that time." "We only spoke with the occupants of the car until the last ticket was signed. Once the last ticket was signed they were free to leave."

The defense pointed to still photos from the dashcam video showing the license plate was illuminated by a functioning tail lamp, and argued there was no violation of section 24601. The prosecutor acknowledged the license plate was illuminated by one taillamp, but argued that any broken taillight was a violation of section 24601. The prosecution also argued the detention was not prolonged because the officers were "conducting their own conversations with the other passengers in order to determine their identification and to eventually cite them for the seat[]belt violation."

---

[3] The parties and the trial court also discussed a second statute, Vehicle Code section 24252, which provides in pertinent part: "All lighting equipment of a required type installed on a vehicle shall at all times be maintained in good working order." (Veh. Code, § 24252, subd. (a).)

The trial court denied the suppression motion.  The court was of the view that section 24601 does not require two lights, and focused instead on the statute's requirement that a rear license plate be both illuminated and legible from a distance.  The court found that the license plate was illuminated by one lamp but that there was an absence of evidence as to whether the plate was legible:  "[T]he plate was illuminated . . . the officer said he could see the plate.  But there wasn't further questioning from either side whether the plate itself was legible.  [¶] . . . [¶] I find nothing in the record to say that from that distance, even with a burnt-out light, the lettering on the plate was still clearly legible to the officer."  The video footage, the court found, was not "accurate" because of the "reflective" nature of the plate which made it "hard to view . . . what was necessarily visible . . . ."  Finally, the court concluded the stop was not unlawfully prolonged because writing "tickets can take a while . . . with four individuals."

White's counsel later moved for reconsideration of the court's ruling, which the trial court denied.

### 3)    *The Traffic Stop Did Not Violate the Fourth Amendment*

White argues the trial court erred in denying the motion to suppress because the prosecution did not meet its burden of showing Officer Schilling had a reasonable suspicion of a Vehicle Code violation.  The trial court, White contends, inverted the burden of proof when it ruled against him on the ground that White had failed to show substantial evidence that the license plate was legible.  In White's view, Officer Schilling was mistaken in concluding that section 24601 required that both license plate lights be operational.  Lastly, White argues "it

11

would not serve the principles of the Fourth Amendment to allow police officers to declare reliance on the mistaken reading of a statute and then to beg forgiveness based upon a reasonableness argument while all the while the real reason for the stop was otherwise illegal."

Under the Fourth Amendment, law enforcement must obtain a warrant before conducting a search or seizure unless an exception to the warrant requirement applies. (See, e.g., *People v. Williams* (1999) 20 Cal.4th 119, 125–126.) "When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment." (*Brendlin v. California* (2007) 551 U.S. 249, 251.) Where a defendant challenges the lawfulness of a search or seizure, "the People are obligated to produce proof sufficient to show, by a preponderance of the evidence," that one of the exceptions to the warrant requirement is applicable. (*People v. Romeo* (2015) 240 Cal.App.4th 931, 939.)

One exception is that a warrant is not required for a brief investigatory stop supported by reasonable suspicion of a crime. (See, e.g., *Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766, 779–780 ["A 'brief, investigatory stop' is justified where an officer has 'reasonable, articulable suspicion that criminal activity is afoot,' implicating the suspect."].) "[T]o justify this type of seizure, officers need only 'reasonable suspicion' — that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law. [Citation.]" (*Heien v. North Carolina* (2014) 574 U.S. 54, 60 (*Heien*).)

That a police officer makes a mistake about the law or the true facts does not automatically render the suspicion

unreasonable. (*Heien*, *supra*, 574 U.S. at p. 66.) However, "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. [Citation.]" (*Ibid.*; see *People v. Campuzano* (2015) 237 Cal.App.4th Supp. 14, 16 ["an objectively reasonable mistake of law can give rise to a reasonable suspicion under the Fourth Amendment"].)

In reviewing the trial court's denial of a motion to suppress, we defer to the trial court's factual findings where supported by substantial evidence. (See *People v. Woods* (1999) 21 Cal.4th 668, 673.) We review independently whether the search or seizure was legal under the Fourth Amendment requirement of reasonableness. (*People v. Camacho* (2000) 23 Cal.4th 824, 830–831.)

Here, the trial court upheld the warrantless seizure of the occupants of the car based on a finding of insufficient evidence the license plate was legible as required by section 24601. We agree with White that the manner in which the trial court expressed its ruling erroneously placed the burden of proof on the moving party when, in fact, the prosecution bore that burden. The lack of critical evidence, if there was any, inured to the detriment of the prosecution. (See *Romeo*, *supra*, 240 Cal.App.4th at p. 939.)

On appeal "we consider the correctness of the trial court's ruling *itself,* not the correctness of the trial court's *reasons* for reaching its decision. [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

White offers that the correct interpretation of section 24601 is that only one license plate light needs to be functional if the

rear plate is illuminated and is legible from 50 feet. However, for present purposes the authoritative interpretation of the statute is not the test. Instead, we ask whether any misunderstanding of section 24601 by Officer Schilling was objectively reasonable under the facts of the case and thus supported the stop and detention. "The question . . . is not whether [defendant's] vehicle was in fact in full compliance with the law at the time of the stop, but whether [the officer] had ' "articulable suspicion" ' it was not. [Citations.]" (*People v. Saunders* (2006) 38 Cal.4th 1129, 1136.) " ' "[R]easonableness," with respect to this necessary element, does not demand that the government be factually correct in its assessment.' " (*Ibid.*)

The trial court found the broken license plate lamp rendered the license plate less visible and legible than "if both [lights] had been working." While there was still some illumination, and the prosecution did not present evidence the plate was illegible from a distance of 50 feet, we also do not "call upon the officers to be scientists" and measure the extent of illumination from a specific distance. (*People v. Niebauer* (1989) 214 Cal.App.3d 1278, 1292.) Williams's license plate was designed to be illuminated from both sides, and that the plate lacked illumination from one side was an objectively reasonable basis for suspecting that the plate was not "clearly legible" in the darkness at a distance of 50 feet in violation of section 24601.

We also observe that section 24601 not only requires a license plate to be illuminated and legible, but also includes the provision that, "When the rear license plate is illuminated by a lamp other than a required taillamp, the *two lamps* shall be turned on or off only by the same control switch at all times." (Emphasis added.) This reference to "two lamps" being "turned

14

on" at the same time could be construed to suggest that when a license plate is designed to be illuminated by two lamps, both lamps must be functional. It is true that other parts of the statute suggest that one license plate light may be permitted and the "two lamps" may be referring to one taillamp and one license plate light. The statute reasonably could be read either way.

Finally, White acknowledges that an officer's " 'subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis.' " Yet, he argues that the dashcam video establishes that the officers "had decided to stop the vehicle prior to observing the license plate light." White points to the officers' comments captured on the dashcam video that they had been watching these men all day, and waiting for them. Specifically, when one of the passengers protested that the officers were giving them a hard time, Officer Garcia said he had "circled" the passengers' gathering "like 10 times" that day, and "obviously, we're gonna contact you eventually." As Officer Garcia put it, the officers had "let" the passengers "have" their party, and thus, these men were now obligated to "let" the officers "do [their] thing." When one of the passengers asked if the officers had pulled over other cars coming from the passengers' gathering, Officer Schilling said they had. Officer Schilling volunteered, "I was there all day. Didn't you see me drive up and down that street all day?" Connecting the dots, the passenger responded, "Y'all was waiting just to . . . ." "Duh," Officer Schilling replied.

While we agree that these statements indicate the officers pulled Williams's car over primarily to investigate the gang ties of the occupants, the United States Supreme Court has "made clear that Fourth Amendment challenges based upon a claim that a seizure or search was 'pretextual' are without merit. (See

15

*Whren v. United States* (1996) 517 U.S. 806, 813.)" (*People v. Letner and Tobin, supra*, 50 Cal.4th at p. 144 [that an officer may have had a "grudge" against the defendants did not make the stop illegal].) "We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." (*Whren v. United States, supra*, 517 U.S. at p. 813.)[4]

### B. *White's Motion to Suppress His Statements to the Police*

#### 1) *The Interrogation*

On May 7, 2015, three weeks after the shooting, Detective Jose Calzadillas and his partner interviewed White at the station. Detective Calzadillas advised White of his *Miranda* rights and White said he understood them, and talked to Detective Calzadillas at length. White acknowledged he was a 4-8 Gangster Crips gang member, and that he was in the car during the April 13th shooting. He was equivocal as to whether there were three or four people in the car. He said a man called Tiny Manson was driving—Williams's moniker was "Little Manson"—and identified a picture of the car. Eventually, White asked to see his mother, and the detectives let her speak with him. White then asked Detective Calzadillas for a lawyer. The detective ignored the request,[5] and kept questioning White for approximately another half an hour.

---

[4]     Neither White nor the Attorney General discuss "pretextual stop," presumably because of the authorities we cite in the text.

[5]     "[Defendant White]:  Can I get a lawyer, man?
"[Detective Calzadillas]:  You want a lawyer?
"[Defendant White]:  Yeah, man."

16

The following day, on Friday, May 8, 2015, Detective Calzadillas met with White again. The detective said, "your mom got a hold of the detective and said you want to talk to us again?" White responded in the affirmative. Detective Calzadillas asked if White understood that "everything [they] talked about yesterday still stands in effect [–] That you[r] rights and all that stuff stands . . . ." White asked if he could "have a lawyer . . . for my thing. . . . I'm not talking about for today." The detective responded, "Oh, yeah, if you wanted to have the lawyer later on the road, it's fine. But do you want to talk to us now without one?" White responded, "Uh, yeah, it's all right."

White proceeded to talk with Detective Calzadillas. White said there were four people in the car, and admitted that Williams was driving the car. Detective Calzadillas then let White speak with detective Stacey Symkowiak, who knew White and his family. Detective Symkowiak encouraged White to cooperate with the investigation. White said to her at one point, "I need somebody here. . . . My attorney, or somebody." Detective Symkowiak told him, "You don't have an attorney yet," that counsel would not be assigned to him until he went to court "on Monday," and "If you think that's gonna be your lifeline, you're fooling yourself." She told him, "The only chance you have

---

"[Detective Calzadillas]: I'm telling you right now, you're going to jail for murder. You have that right. But I'm telling you right now, since you're not saying anything, I – based off my investigation, you're going to jail for murder. Is that how you want to leave it?

"[Defendant White]: Man.

"[Detective Calzadillas: Is that how you want to leave it?

"[Defendant White: Man, like – why y'all – can y'all talk to somebody else since I'm not the only one here?"

17

right now is that . . . you may not have played as bad of a part as they did, and your chance, your opportunity is to tell" the detectives.

White then spoke with Detective Calzadillas again, and said again there were three or four people in the car. White continued to assert that another passenger in the car had fired the shots.

### 2) *The Motion to Suppress*

White moved pretrial to suppress his statements to the detectives for violating his right to counsel. The trial court granted the motion in part. The court found that White had implicitly waived his right to counsel at the beginning of his May 7 interview because Detective Calzadillas advised him of his *Miranda* rights and White indicated he understood them and began talking. However, the court found that after White's mother talked with him, White invoked his right to counsel by asking for a lawyer. The court suppressed the rest of White's statements that day. The court further found that the following day, when White asked to speak with the detectives, White again implicitly waived his rights and freely talked with the detectives by initiating a new conversation.

### 3) *The Admissibility of White's Statements after Speaking with Detective Symkowiak*

White contends that the trial court erred in failing to suppress the statements he made after his conversation with Detective Symkowiak because he had asserted his right to counsel. His argument turns on his statement to the detective that he needed "somebody here . . . [m]y attorney or somebody." He claims Detective Symkowiak "nullified" his right to counsel by badgering him to talk to Detective Calzadillas, and telling White

18

he could not have counsel until he went to court on Monday, three days later.[6] We conclude the statements were properly admitted.

"If a defendant waives his right to counsel after receiving *Miranda* warnings, police officers are free to question him. [Citation]. If, post-waiver, a defendant requests counsel, the officers must cease further questioning until a lawyer has been made available or the defendant reinitiates. [Citation.] However, the request for counsel must be articulated 'unambiguously' and 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' [Citation] If a defendant's reference to an attorney is ambiguous or equivocal in that 'a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [precedent does] not require the cessation of

---

[6] Respondent argues White forfeited this argument because he did not argue before the trial court that he had invoked his right to counsel during his conversation with Detective Symkowiak. Even if White forfeited the claim due to his counsel's failure to specifically argue that his statements to Detective Symkowiak invoked his right to counsel, because the issue appears to be one of law based on undisputed facts we exercise our discretion to reach the merits of his claim. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party."]; cf. *People v. Linton* (2013) 56 Cal.4th 1146, 1166 [finding forfeiture where "no opportunity was presented to the trial court to resolve any material factual disputes and make necessary factual findings"].)

questioning.' [Citation.]" (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 19.)

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.) Where a defendant's statements to the police are undisputed, "we engage in a de novo review of the legal question of whether the statement at issue was [admissible]." (*Ibid.*)

Here, White's statements—"I need somebody here. . . . My attorney, or somebody."—were equivocal as they referred to needing either an attorney "or" some other person. (See *People v. Frederickson* (2020) 8 Cal.5th 963, 1011 [a defendant did not unequivocally invoke his right to counsel when he asked, " 'Hey, when am I going to get a chance to call my lawyer?' "].) This conveyed to a reasonable officer that White might want to invoke his right to counsel, not that he was unambiguously expressing his desire to terminate the conversation. (See *Bacon, supra*, 50 Cal.4th at pp. 1104–1105.) In the context of the exchange, White was not asking for a lawyer at that moment, but was talking with Detective Symkowiak about how to proceed with his interrogation by Detective Calzadillas.

Detective Symkowiak was not questioning White about the crime; she was urging him to cooperate: she counseled White to tell Detective Calzadillas "the truth" and to not "play these games." She ostensibly had interrupted White's interrogation to advise White to cooperate because White's family had been

20

"calling" her and "begging" her to help him. White indicated familiarity with Detective Symkowiak by addressing her by her first name, and asking her to explain why the police would charge him with murder.

In this context, a reasonable officer could have concluded that White did not indicate that he wanted to stop his conversation with detectives immediately and consult counsel. We conclude the trial court did not err in admitting the statements White made after he spoke with Detective Symkowiak.

### C.     *The Admission of a Photo Showing White with a Gun*

White argues the trial court abused its discretion in admitting a photo showing him making gang signs while posing with a handgun in his waistband. The prosecution pointed to the photo when questioning a defense witness, and asked hypothetically if the photo showed that the person with a gun was a "shooter for the gang." The witness responded, "He could be." White now argues this evidence was impermissible character evidence that had no relevance other than to show he was the sort of person who carries a gun.

Evidence of prior weapon possession may be admissible when relevant to prove some fact (e.g., motive, opportunity, preparation, knowledge or identity) other than a defendant's disposition to possess weapons or to commit a crime. (Evid. Code, § 1101, subd. (b).) However, such evidence should not be admitted if its probative value is substantially outweighed by the probability of undue prejudice, confusion of issues or misleading the jury. (Evid. Code, § 352; *People v. Davis* (2009) 46 Cal.4th 539, 602.) " 'We review for abuse of discretion a trial court's

rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352.' " (*Davis*, *supra*, at p. 602.)

We conclude the photo of White with the gun was admissible under Evidence Code section 1101, subdivision (b). White's motive and intent in shooting and murdering two people were relevant to the prosecution's theory that White was a gang member who committed the crime as an attack on a rival gang. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1073 [evidence that the defendant "possessed numerous firearms had 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' [], namely, that he was a gang member at war with a rival gang"].) Nor was the evidence of a tucked-in pistol unduly prejudicial in comparison to evidence of the violent drive-by shooting. The trial court did not abuse its discretion in concluding the photo's probative value was not substantially outweighed by its prejudicial effect.

### D.    Cumulative Error

White contends his convictions must be reversed for cumulative error. Because we have no found error, the claim of cumulative error is without merit." (See, e.g., *People v. Reed* (2018) 4 Cal.5th 989, 1018.)

## II.
## Defendant Williams's Appeal

### A.    Williams Was Required File a Petition Under Section 1170.95 to Seek Relief Under SB 1437

With only slight deviation, Williams raises only a single argument in his opening brief—he was entitled to be resentenced under SB 1437. He does not join in the arguments of defendant

White and accordingly we do not consider those arguments in Williams's appeal.

"Senate Bill 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) Substantively, Senate Bill No. 1437 accomplishes this by amending [Penal Code] section 188, which defines malice, and [Penal Code] section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability. Senate Bill No. 1437 also adds the aforementioned section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts. . . .' (§ 1170.95, subd. (a).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723 (*Martinez*).)

Williams argues his murder convictions must be vacated under SB 1437 because it was undisputed he was not the shooter, and the jury did not make findings that he was a major participant in the crimes or that he acted with reckless indifference to human life.[7] The striking flaw in this argument is

---

[7] Williams also argues we should reverse his firearm enhancement because of a "change" in the law, but he does not identify what change he is referring to or cite to any authority. We observe that White's trial counsel informed the court of its discretion under Senate Bill No. 620 to impose a lesser firearm

that SB 1437 relief must be pursued first in the trial court by way of a petition for resentencing under section 1170.95. (*Martinez*, *supra*, 31 Cal.App.5th at p. 729 ["we hold the section 1170.95 petition procedure is the avenue by which defendants with nonfinal sentences of the type specified in section 1170.95, subdivision (a) must pursue relief . . . [¶] . . . [¶] [A] defendant retains the option of seeking to stay his or her pending appeal to pursue relief under Senate Bill 1437 in the trial court."].) Our Supreme Court recently upheld *Martinez* and the other Court of Appeal decisions that have held SB 1437 relief is not available on direct appeal.[8] (*People v. Gentile, supra*, __ Cal.5th __ [2020 WL 7393491].) Williams's present effort to raise the issue on appeal fails. Accordingly, we affirm his convictions.

---

enhancement, and the court recognized that it had "the discretion to strike or stay" the enhancement under section 12022.53, subdivision (d). The trial court chose not to do so.

[8] The Supreme Court's opinion in *Gentile* was filed several months after briefing in this appeal was complete. *Gentile* cites approvingly and quotes from *Martinez*. During briefing, counsel for Williams was aware that *Martinez* had held that SB 1437 relief was not available on direct appeal. On April 8, 2019, counsel filed a "Petition for Stay of Appeal Pending Outcome of Petition to Vacate Convictions Based on California Penal Code section 1170.95 and People v. Martinez." Counsel stated in his petition to stay the appeal that "there is no direct right of appeal from a conviction of first or second degree murder under the change in the California felony murder rule" and noted that the Court of Appeal had "recently addressed the issue of direct appealability in the case *People v. Martinez[, supra,*] 31 Cal.App.5th [at p.] 719."

24

## *DISPOSITION*

The judgments against appellants White and Williams are affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

MOOR, J.

25