Filed 8/26/22 P. v. Fike CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE , <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JOHN CARL FIKE, <br><br> Defendant and Appellant. | F083103 <br><br> (Super. Ct. No. BF179066A) <br><br><br> **OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Kern County. Colette M. Humphrey, Judge.

Robert F. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Cavan M. Cox II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Poochigian, Acting P. J., Franson, J. and Snauffer, J.

After the trial court denied two motions to suppress evidence, defendant John Carl Fike pled no contest to second degree burglary (Pen. Code, § 460, subd. (b); count 1) on June 8, 2021. The court granted him two years' probation. On appeal, he contends the trial court erred in denying his two motions to suppress evidence. We affirm.

## DISCUSSION

The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement, and a warrantless search or seizure is presumed to be unreasonable unless the search falls within a recognized exception. (U.S. Const., 4th Amend.; *Mincey v. Arizona* (1978) 437 U.S. 385, 390; *Katz v. United States* (1967) 389 U.S. 347, 357; *People v. Williams* (1999) 20 Cal.4th 119, 125–126.)

A defendant may move to suppress evidence obtained as a result of a warrantless search or seizure on the ground that "[t]he search or seizure without a warrant was unreasonable." (Pen. Code, § 1538.5, subd. (a)(1)(A).) When a defendant challenges the lawfulness of a search or seizure, "the People are obligated to produce proof sufficient to show, by a preponderance of the evidence," that one of the exceptions to the warrant requirement is applicable. (*People v. Romeo* (2015) 240 Cal.App.4th 931, 939.)

On review of the trial court's denial of a motion to suppress, " ' "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." ' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1053.)

## I. Officer Hardin's Detention of Defendant

On January 24, 2020, the hearing on the first suppression motion was held. Defendant moved to suppress evidence obtained as a result of a warrantless traffic stop. He contended an anonymous tip was insufficient to provide the officer a reasonable suspicion that defendant was involved in criminal activity and thus the detention was unlawful.

2.

### A.    Evidence

On November 16, 2019, an anonymous tipster called the police at 3:18 a.m. and again at 3:28 a.m., stating that a white Ford F-150 was repeatedly going behind a large hardware/appliance store (the store), and someone was possibly utilizing a strap to remove washing machines from a shipping container. The tipster had just observed the behavior. At approximately 3:57 a.m., Bakersfield Police Officer Eric Hardin was dispatched to the store based on the tip. He arrived at about 4:04 a.m. and went to the back of the store near the loading docks. He did not see any vehicles, so he called the tipster back for more information at about 4:06 a.m. The tipster said he had been at the nearby gas station (which was 75 yards from the container) when he saw an older-model white Ford F-150 occupied by two white males drive behind the store. Then it looked like they were using a strap to remove washing machines from a container and load the machines into the F-150. They drove away and came back (without the machines) twice to repeat the same activity. The tipster stated that at one point, he left the gas station and went closer behind the store.

While Hardin was speaking to the tipster, he located an approximately 25-foot-long container with its front door open and without a lock. He also saw a large three-pallet stack of cinder blocks about five feet away from the container's doors. As Hardin was sitting in his vehicle looking at the container, an older white Ford F-150 came around the corner to the back of the store, then quickly made a U-turn and drove away. This was significant to Hardin because the vehicle matched the tipster's description, the vehicle came to the location described by the tipster, and the vehicle's return to the scene matched the repeated pattern described by the tipster. In addition, it was 4:00 a.m. Hardin turned on his lights and conducted a traffic stop of the F-150, which stopped in the driveway leading from the store into the gas station.

Hardin contacted the two men in the F-150. Defendant was the driver and his son was the passenger. Hardin asked for the men's identification and asked where they lived.

3.

Both identification cards listed the same address on Handel Avenue and both men said they lived there. Hardin requested a back-up officer and conducted a records check, learning that defendant's license was suspended. After Bakersfield Police Officer Steven Ronfeldt arrived, Hardin inspected the container. In front of the container, he noticed a thick liquid on the cement that contained drag marks and footprints. The two men's shoes appeared to match the footprints. Within minutes, Hardin spoke to the store's manager and learned that the container had been full of washing machines and its doors had been locked. The men did not have permission to be in the container. Surveillance camera footage showed an older vehicle, which appeared to be the same or similar to the men's F-150, driving along the back of the store and stopping at 2:10 a.m. Two people, both wearing black jackets, appeared to use a strap to wrap around the cinder block pallets and pull them away from the container. The people went out of the camera's view and, about 10 minutes later, got back in the vehicle and drove away. They returned in about an hour, then returned for a third trip about 20 minutes after the second. In the second and third trips, they could be seen moving cardboard boxes that were consistent with the packaging of washing machines.

Hardin informed the men they were going to be placed under arrest. When Hardin conducted an inventory search of the vehicle, he found two black jackets and a bag containing a lock pick set. Hardin advised Ronfeldt it would be relevant to the investigation to contact the resident at the Handel Avenue residence, which Ronfeldt did shortly thereafter.

The trial court denied the suppression motion, concluding there was "nothing wrong with this stop" and finding it "constitutional," "permissible," and "good police work."

### B. Analysis

The Fourth Amendment prohibits seizures of persons, including investigative detentions that are unreasonable, even if brief. (*Whren v. United States* (1996) 517 U.S.

4.

806, 809–810; *Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16.)  A traffic stop is a seizure of the occupants of the vehicle within the meaning of the Fourth Amendment.  (*Heien v. North Carolina* (2014) 574 U.S. 54, 60; *Brendlin v. California* (2007) 551 U.S. 249, 251.)  But a brief investigatory stop of a vehicle based on an officer's objectively reasonable suspicion that the person detained has engaged in criminal activity is a well-recognized exception to the warrant requirement.  (*United States v. Twilley* (9th Cir. 2000) 222 F.3d 1092, 1095.)  "[T]o justify this type of seizure, officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law."  (*Heien*, at p. 60; *People v. Souza* (1994) 9 Cal.4th 224, 231 ["A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity."].)  "The officer's subjective suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." ' " (*People v. Wells* (2006) 38 Cal.4th 1078, 1083 (*Wells*).)

   " 'Reasonable suspicion is a lesser standard than probable cause, and can arise from less reliable information than required for probable cause, including an anonymous tip.' " (*People v. Dolly* (2007) 40 Cal.4th 458, 463 (*Dolly*), quoting *Wells*, *supra*, 38 Cal.4th, at p. 1083; *Alabama v. White* (1990) 496 U.S. 325, 330–331 ["reasonable suspicion can arise from information that is less reliable than that required to show probable cause"].)  In *Dolly*, our Supreme Court stated: "A tip's reliability … need not depend exclusively on its ability to predict the suspect's future behavior [citation] or the officer's ability to corroborate present illegal activity [citation].  Rather, the tip's

reliability depends upon an assessment of 'the totality of the circumstances in a given case.' " (*Dolly*, at p. 464.) An anonymous tip of low reliability, if corroborated by an officer's personal observation or if deemed urgent due to exigent circumstances, can provide reasonable suspicion under the totality of circumstances (e.g., *White*, at pp. 330–331; *Wells*, at p. 1083); however, some tips, if lacking adequate detail or corroboration by an officer's personal observations, are insufficiently reliable to provide reasonable suspicion (e.g., *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*); *People v. Saldana* (2002) 101 Cal.App.4th 170).

Defendant cites *J.L.* for the broad proposition that "[a]n anonymous telephone tip about an individual may not create a reasonable suspicion justifying a stop." In *J.L.*, an anonymous tipster stated that a person wearing a plaid shirt was waiting at a specific bus stop and was carrying a concealed weapon. According to the Supreme Court, the tip was insufficiently detailed because the caller did not explain how he knew about the concealed weapon or supply any other information demonstrating that his information was reliable. (*J.L.*, *supra*, 529 U.S. at p. 273.)

In *People v. Saldana*, the court also found an anonymous tip inadequate, explaining: "The tip contained no internal indicia of the basis for or reliability of the informant's information. The tip did not include predictive information that could be corroborated by observation. The observed corroboration that a vehicle fitting the description was indeed present at the described location did not corroborate the criminal element of the tip that the station wagon contained a gun or cocaine. Appellant's observed conduct of exiting the restaurant, entering the station wagon, and driving away was not suspicious." (*People v. Saldana*, *supra*, 101 Cal.App.4th at p. 175.)

In *Dolly*, our Supreme Court distinguished *J.L.* In *Dolly*, an anonymous tipster, who reported that he had just been assaulted with a firearm, provided the location of the car as "parked on the north side of Jefferson Boulevard at Ninth Avenue," and described the perpetrator "as a light-skinned African-American male with a cast on his arm, in a

possibly gray Nissan Maxima on the north side of Jefferson, and was said to have threatened the [tipster] with a gun. Two or three minutes later, the officers arrived at the scene and spotted a black Nissan Maxima parked on the north side of Jefferson, just east of Ninth. There were three people in the car. Defendant, who was sitting in the driver's seat, matched the description provided in the radio dispatch. He also had a cast on his left arm." (*Dolly*, *supra*, 40 Cal.4th at p. 462.) The Supreme Court concluded the tip was more reliable than the one described in *J.L.* because it was "a firsthand, contemporaneous description of the crime as well as an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived." (*Dolly*, at p. 468.) According to the court, a primary determinant of a tip's reliability is the basis of the tipster's knowledge, and that reliability is enhanced by the tipster's contemporaneous viewing of the suspicious activity. (*Ibid.*)

Here, the tipster witnessed the men's suspicious behavior and apparent burglary of washing machines three times in the early morning hours from the gas station next to the store, and he reported them to the police contemporaneously (or very nearly so). When Hardin called the tipster back, he provided even more details. His tips described the two men as white and their vehicle as an older white Ford F-150. He described details of the crimes—the men's use of a strap to facilitate the apparent burglary of the washing machines from a shipping container behind the store. He reported that the men returned to the same container two more times and repeated the same apparent burglary, each time returning with an emptied truck. These details, based on the tipster's personal and contemporaneous viewing of the repeated pattern of activity suggested the information was reliable. Furthermore, the information was corroborated when, within minutes of Hardin's arrival, two white men and their older white Ford F-150 arrived at the exact scene of the crime shortly after 4:00 a.m., then immediately turned around and departed. These observations corroborated the tip's descriptions of the men, their vehicle, and their pattern of returning to repeat their crime. The men's flight at the sight of the patrol

7.

vehicle further corroborated the criminal element of the information, suggesting the men were guilty of the crimes and were attempting to avoid discovery and arrest. Under the totality of the circumstances, the tip, as corroborated by Hardin's personal observations, was reliable and sufficient to provide Hardin reasonable suspicion that these two men had repeatedly been stealing washing machines and were again returning to the scene to continue their ongoing criminal endeavor. We agree with the trial court that defendant's detention did not violate his Fourth Amendment rights.

## II. Officer Ronfeldt's Observation Through the Fence and the Ex-Wife's Consent

On March 4, 2021, the hearing on the second suppression motion was held. Defendant moved to suppress evidence obtained as a result of Ronfeldt's observation into defendant's ex-wife's side yard.[1] Defendant contended Ronfeldt's observation amounted to an unlawful warrantless search.

### A. *Evidence*

#### 1. Officer Ronfeldt's Observation Through the Fence

Hardin testified that when he asked the two men for their residential addresses, they both gave the same address on Handel Avenue. Their identification cards and the truck's registration also stated the same address. Later, when Hardin asked the question again, defendant clarified that the Handel Avenue address was his ex-wife's residence. Hardin asked Ronfeldt to respond to the Handel Avenue residence and contact whomever lived there.

Ronfeldt and another uniformed officer went to the residence on Handel Avenue around 5:00 a.m. or later. Ronfeldt parked off to the side of the house. As he approached the front door, he crossed the property from the side, walking across the wide driveway

---

[1] The trial court found defendant had standing and the People do not challenge it here.

and past a small flatbed trailer parked there. As he walked toward the house and past the side yard's wooden fence, which was about 10 to 15 feet away from him, he could see through a "significant gap" of three inches or less in the fence. He was able to see through the gap without touching the fence, coming closer, or straining in any way. He saw what looked like a brown cardboard box with white labeling, the approximate height of an appliance box, so he approached the fence and saw that there were additional similar boxes.[2] He proceeded to the front door to contact defendant's ex-wife.

### 2. The Ex-Wife's Consent

The ex-wife answered the door and identified herself to Ronfeldt as the homeowner. She said defendant was her ex-husband, and he had not lived at the residence for several years. She said their son stayed there sometimes but did not live there. Ronfeldt told her the nature of the investigation and said he thought there were stolen appliances in her side yard. She went outside and he showed her the boxes through the gap. She did not recognize the boxes, and she told him she knew nothing about them.

At this point, Ronfeldt asked the ex-wife if he could conduct a search. She agreed and gave her consent both verbally and in writing. She consented to a search of the entire

---

[2] Defendant notes that the ex-wife testified it was dark and the only lights were by the front door, and thus it is unclear how Ronfeldt could have seen through the fence. There was no evidence that Ronfeldt used (or needed) a flashlight, but we note that an "officer's use of a flashlight to improve his vision does not affect the plain view of [an item]. 'It is well established law that the observation of that which is in the plain sight of an officer standing in a place where he has a lawful right to be does not constitute a search and such observation is lawful regardless of whether the illumination permitting the observation is natural light, artificial light, or light from a flashlight held by the officer viewing the object in question.' " (*People v. Chavez* (2008) 161 Cal.App.4th 1493, 1501 (*Chavez*); see *People v. Superior Court (Mata)* (1970) 3 Cal.App.3d 636, 639 ["Observation of that which is in view is lawful, whether the illumination is daylight, moonlight, lights within the vehicle, lights from street lamps, neon signs or lamps, or the flash of lights from adjacent vehicles [citation]; that the light comes from a flashlight in an officer's hand makes no difference."].)

property, but Ronfeldt searched only the side yard and garage. At no time did the ex-wife say or do anything to suggest her consent was not freely given, nor did she ever ask Ronfeldt to stop the search.

According to the ex-wife, when Ronfeldt asked her for consent to search, she did not feel threatened by the officers, nor did she ever feel coerced or forced to give her consent. But she did feel threatened by the situation because she worried she could possibly be charged with possession of stolen property. On cross-examination, she explained she did not feel like she could say no because the officers had shown her the property in her side yard and she felt that she could not stand by and claim she was unaware of the property. She was afraid she was going to get in trouble.

During his search of the side yard, Ronfeldt found nine dishwashers, lined up in a row, in their manufacturer's cardboard boxes. The boxes were the same boxes he had seen through the gap in the fence. The ex-wife told Rondfeldt she had not expected defendant or her son in the previous days and she had not seen either of them in the last 24 hours.

The appliances were photographed as evidence, and the store's security retrieved them.

The trial court denied the suppression motion, stating, "I actually find no fault with any of the police work on this case."

### B. Analysis

#### 1. Officer Ronfeldt's Observation Through the Fence

" 'It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' " (*People v. Celis* (2004) 33 Cal.4th 667, 676, quoting *Welsh v. Wisconsin* (1984) 466 U.S. 740, 748.) "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' [Citation.] This right would be of little practical

value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." (*Florida v. Jardines* (2013) 569 U.S. 1, 6 (*Jardines*).)

Thus, the Supreme Court has recognized "the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.' " (*Jardines*, *supra*, 569 U.S. at p. 6; *United States v. Cannon* (9th Cir. 2001) 264 F.3d 875, 880 ["curtilage is important because it expands the constitutional boundaries of the home beyond the four walls of the house"].) "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.' " (*Jardines*, at p. 7.) "The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " (*Id*. at p. 7.) "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. [Citation.] … [T]he central component of this inquiry [is] whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of life." ' " (*United States v. Dunn* (1987) 480 U.S. 294, 300.)[3]

When an officer enters a home's curtilage without a warrant, he or she is permitted to engage in the activities allowed of any private citizen, such as approaching the front

---

[3]  *United States v. Dunn* articulated the relevant factors a court should consider in determining whether a location falls within the curtilage, including "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (*United States v. Dunn*, *supra*, 480 U.S. at p. 301.)  However, "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Ibid*.)

door or standing on the porch and knocking on the front door. (*Jardines*, *supra*, 569 U.S. at p. 8.) *Jardines* explained: " 'A license may be implied from the habits of the country,' notwithstanding the 'strict rule of the English common law as to entry upon a close.' [Citation.] We have accordingly recognized that 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.] This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (*Id*. at pp. 8–9, fn. omitted.)

" 'A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there. The officer who walks upon such property so used by the public does not wear a blindfold; the property owner must reasonably expect him to observe all that is visible. In substance the owner has invited the public and the officer to look and to see.' " (*Chavez*, *supra*, 161 Cal.App.4th, at p. 1500, quoting *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 629.)

" ' "It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. [Citation.] An officer is permitted the same license to intrude as a reasonably respectful citizen. [Citation.] However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy. [¶] What is reasonable cannot be determined by a fixed formula.

12.

It must be based on the facts and circumstances of each case. [Citation.]" ' [Citation.] As summarized by a leading text: '[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.' " (*Chavez, supra*, 161 Cal.App.4th at p. 1500; *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 634 ["observations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense"].)

As noted, an officer within the curtilage is not allowed to use intrusive methods to gain information. (*Jardines, supra*, 569 U.S., at p. 9.) "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. [Citation.] Such conduct thus is presumptively unreasonable absent a warrant." (*Collins v. Virginia* (2018) 584 U.S. ___, ___ [138 S.Ct. 1663, 1670].) As *Jardines* explained: "[I]ntroducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker [on the front door]. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose…. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search." (*Jardines, supra*, 569 U.S. at p. 9, fns. omitted.)

"[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are invited to do that*. The mere 'purpose of discovering

13.

information,' [citation], in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment. But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." (*Jardines*, *supra*, 569 U.S. at p. 9, fn. 4.) In *Jardines*, the court concluded that an officer's use of a trained drug-sniffing dog on the homeowner's porch to investigate the contents of the home constituted a search within the meaning of the Fourth Amendment. (*Id*. at pp. 11–12.)

In this case, assuming the driveway was part of the home's curtilage, we conclude Ronfeldt was nevertheless permitted to walk upon the driveway as he approached the front door to contact the resident, just as a private citizen would be permitted to do. It is not uncommon for visitors to approach a house via the driveway, especially if they are not parked directly in front of the house. Further, some modern houses require use of the driveway to reach the front door. Unlike the intrusive conduct in *Jardines*, Ronfeldt's conduct in walking across the driveway 10 to 15 feet from the fence was unintrusive and merely typical of what a private citizen might do when coming to contact the resident.[4] An implied license allowed ordinary citizens this movement, and Ronfeldt was lawfully

---

[4] This case also differs from *People v. Lovelace* (1981) 116 Cal.App.3d 541, cited by defendant. There, the defendant was growing marijuana, and an officer discovered it only by standing in an alley and peering, from a distance of an inch or two, through knotholes and one-quarter-inch gaps in defendant's privacy fence. (*Id*. at p. 547.) The court noted the fence, which surrounded the backyard of a private residence, had been "repaired and tightened up in order to shield the backyard from public view … for purposes of [e]nsuring privacy." (*Id*. at pp. 548–549). It created an expectation of privacy that was both subjectively and objectively reasonable. (*Ibid*.) The court concluded that because the officer was only able to view the contraband by standing at "a vantage point not expected to be used by the public at large," the search violated the defendant's reasonable expectation of privacy. (*Id*. at p. 554.) By contrast, in the present case, the fence was not maintained to ensure privacy, but contained a significant gap, and Ronfeldt's vantage point was one expected to be used by the public at large, on the driveway 10 to 15 feet from the fence, rather than in the alley one to two inches from the fence.

present on the driveway. From this lawful vantage point, he observed in plain view the cardboard with labeling through the gap in the fence. Defendant had no reasonable expectation of privacy in whatever could be readily seen in plain view through the fence from this lawful vantage point. And after Ronfeldt observed in plain view what he suspected was the cardboard packaging of the stolen appliances, he was justified in moving closer to confirm or dispel his suspicion. (See *People v. Roberts* (1956) 47 Cal.2d 374, 380 ["The radio was in plain sight, and it fitted the general description of property known by the officers to be stolen. Under the circumstances, there appears to be no reason in law or common sense why one of the officers could not pick up the radio and examine it for the purpose of dispelling or confirming his suspicions."])

We conclude no unlawful search occurred when Ronfeldt observed the cardboard with labeling through the gap in the fence. The trial court did not err in concluding Ronfeldt's observation did not violate defendant's Fourth Amendment rights.

### 2. The Ex-Wife's Consent

A warrantless search may be justified by valid consent from a person who has the right to authorize the search. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219; *People v. Woods* (1999) 21 Cal.4th 668, 674–676.) Such consent must be freely and voluntarily given by a person who has authority over the target premises. (See *Schneckloth*, at p. 227 [whether consent was voluntary or was the product of coercion on the part of searching officers is a question of fact to be determined from the totality of the circumstances].) "Where, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the … manifestation of consent was the product of [the person's] free will and not a mere submission to an express or implied assertion of authority.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

Here, the ex-wife gave Ronfeldt verbal and written consent to search her property after she unexpectedly learned that the cardboard boxes, which probably contained stolen

property, were in her side yard. Her authority to consent was established when she informed Ronfeldt she was the owner of the property. The only remaining question is whether her consent was the result of her freewill or of an assertion of Ronfeldt's authority.

Although some of the ex-wife's testimony suggested she felt pressured to consent, we believe substantial evidence supported the conclusion that any pressure she felt was a result of her having just learned that stolen property had been hidden in *her* yard and that her own ex-husband and son had exposed *her* to criminal liability—and that this unexpected and unwelcome information led her to realize it would be best for her to allow the police to investigate. (*People v. Suff*, *supra*, 58 Cal.4th at p. 1053 [we defer to the court's implied findings that are supported by substantial evidence].) The record supports the trial court's implied finding that the ex-wife's consent was valid and that Ronfeldt's entry and search of the side yard were justified by that consent. (See *People v. Suff*, *supra*, 58 Cal.4th at p. 1053 [we defer to the court's implied findings that are supported by substantial evidence].) We again conclude the trial court did not err.

## DISPOSITION

The trial court's orders denying the two motions to suppress are affirmed.

16.