Filed 7/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060536 |
| v. | (Super. Ct. No. 20NF1026) |
| KEANDRE KELVON SESSION, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Andrew Mestman and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Keandre Kelvon Session was convicted of five counts of residential burglary, street terrorism, and numerous enhancements. He offers two arguments on appeal. First, he claims the placement of a GPS surveillance device on his vehicle without a warrant was unconstitutional because the officer who did so did not offer specific testimony as to how he knew that defendant (who was, indeed, on parole) was on parole. We conclude this argument has no merit because no case or statute has ever articulated such a requirement with respect to parolee searches and we publish to clarify the law in this area. Second, defendant contends that due to changes in the law, he is entitled to a new trial where the gang counts are bifurcated from the other charges. Even if this change in the law should be retroactively applied, we find that any error was not reasonably likely to change the outcome of the case. Accordingly, we affirm the judgment.

I

FACTS

Defendant was charged in an amended information with five counts of first degree residential burglary pursuant to Penal Code section 462, subdivision (a)[1] (counts one, three, five, seven & nine), four counts of misdemeanor petty theft pursuant to sections 484, subdivision (a) through 488 (counts two, four, six & eight), and street terrorism pursuant to section 186.22, subdivision (a) (count 10). It was further alleged that as to count one, the victim was present in the residence during the burglary (§ 667.5, subd. (c)(21)); as to the burglary counts, the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)); and that defendant had two or more serious or violent felony convictions (§§ 667, subds. (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(A), 1192.7).

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

2

*Burglaries and Investigation*

This case arises from a series of residential burglaries in 2019. On November 2, 2019, Brice H., who lived in Manhattan Beach, returned home to find his master bedroom's closet in disarray and several items missing, including two Rolex watches. Upon watching footage from his home security system, he saw a white Audi he did not recognize back into his driveway. Two people he did not know were in the video, and he saw them exit the car. He had not given them permission to take his property. His daughter testified that she and her sister had been home all day.

On November 21, Karen B.'s Redlands home was burglarized, with jewelry and a firearm missing.

Vivian Z. lived in Yorba Linda, she had a security system with cameras that allowed remote monitoring through a phone app. On November 21, she observed two men remove a gold statue from her home through the app. Upon returning home, she found her bedroom ransacked and the kitchen door broken. In addition to the statue, a watch was taken.

On December 3, Joseph H., who lived in Fullerton, left his home in the morning to run errands, setting his security alarm before he departed. Upon returning 45 minutes later, he returned to find a broken window and the police waiting for him. A security alarm had notified the police, who had found the front door open upon their arrival, but no intruders in the home.

On the same day, Kinney B., also a Fullerton resident, returned home from work in the evening. His daughter asked if there had been an earthquake, as her bedroom was in disarray. His own bedroom was missing watches, jewelry, and coins.

Also on December 3, Corona resident Bryan C. witnessed people breaking into his house on his security app. When he returned home, he found his sliding glass door had been broken, and he was missing a firearm and a cell phone.

3

On December 20, just after noon, an Orange County Sheriff's Deputy pulled over a white BMW in Yorba Linda. The location of the stop was approximately 100 yards from the Yorba Linda burglary on November 21. Defendant was driving with three passengers, including his girlfriend and another individual implicated in the burglaries, Kevin Mendez. During the stop, defendant admitted he was on parole. Investigator Roberto Miranda of the Orange County Sheriff's Department, who had been investigating the burglaries since November 21, was aware that the license plate on the BMW was considered a suspect vehicle in several of the burglaries. Based on this information and other investigative leads, Miranda had already identified defendant and Mendez as possible suspects in the string of burglaries. Miranda arrived on the scene of the traffic stop and placed a GPS tracking device on the vehicle before allowing it to leave. Miranda was aware defendant was on parole. After the stop, Miranda prepared a search warrant, which was approved later in the day.

Also on December 20, Emma E., who lived in Poway, returned home in the early evening with her husband. Their home had been burglarized and designer purses and shoes were missing.

Around 7:30 that evening, a deputy sheriff patrolling in Poway was asked to contact a white BMW. He spotted the vehicle and initiated a traffic stop. The car initially yielded, then sped away. During the pursuit, at least one item was thrown from the vehicle. The pursuit ended when the vehicle crashed, and several occupants scattered in different directions. Deputy Robert Harrell, who had joined the pursuit after the vehicle fled, described one of the occupants as a man wearing a white hooded sweatshirt, and another as wearing a blue shirt. Harrell eventually apprehended the man wearing the blue shirt and identified him as defendant at trial.

San Diego County Sheriff Detective Sergeant Elisha Hubbard was working as a detective at the Poway station in December 2019. She participated in the burglary investigation which led to defendant's arrest. She and her partner interviewed defendant,

4

who denied driving anyone to a robbery, stating he drove them to a park. At the collision site where the pursuit ended, Hubbard recovered a Gucci purse, which had been recovered from the car after the chase. Another purse had been recovered from the side of the highway. Inside, she found an ID card that belonged to defendant, as well as a Samsung cell phone. The phone displayed some messages and photographs of defendant. The phone was locked, but eventually the data was extracted by investigators. An analysis of the data revealed an e-mail address associated with defendant was linked to the phone. The phone also had a large number of photos and messages, including pictures of watches and text messages referencing the letters "PJ."

The San Diego sheriff's investigators also retrieved data from a phone belonging to Mendez. Mendez appeared in the surveillance camera footage from the Corona burglary. Analysis revealed that the Samsung and Mendez's phone exchanged calls or used data from cellular towers or was pinpointable using Google location data near several of the burglaries, including the ones in Manhattan Beach, Redlands, and Yorba Linda. Both phones were also connected to towers near the Fullerton and Corona burglaries during the relevant time periods.

At trial, the prosecution also presented evidence about defendant's use of the white Audi and the white BMW that had been seen at several of the burglaries. Both vehicles were registered to Lacrisian M. She testified that she owned the BMW from early 2019 until December 2019, when she sold it to Calvinisha Baker, defendant's girlfriend. She had also owned the Audi since March 2018. She let defendant drive the Audi between five and 10 times in 2019.[2]

---

[2] The witness gave conflicting versions of events. She told an investigator that defendant drove the Audi between December 2018 and December 2019, at which point he bought the Audi. At trial, she denied telling the investigator that she had sold the Audi to defendant, but stated it was "his, like his car." She also said that she allowed other people to drive the Audi and the BMW, including defendant's brother.

5

Several law enforcement officers saw defendant drive the Audi in question in 2019. They pulled over the car on November 4, 2019. On November 10, Baker was driving when they were pulled over in Barstow. Defendant was in the passenger seat and stated he was purchasing the car. As stated above, defendant was also pulled over in the BMW on December 20, the day he was ultimately arrested.

*Gang Evidence*

Gang evidence was presented at trial by numerous law enforcement witnesses. Two officers from the Los Angeles Police Department (LAPD) testified that in the past, on multiple occasions, defendant had admitted he was an active participant in the PJ Watts Crips.

LAPD officer Robert Martinez, who spent five years working in the Gang Enforcement Detail, testified as the prosecution's gang expert. One of his main areas of expertise was the PJ Watts Crips street gang. Martinez had spoken to many members of the gang, read and reviewed reports and crimes involving members of the gang, and studied cases where members had been convicted. He had also spoken to members informally about the gang's culture and customs. He described the gang's territory, logo, tattoos, and hand signals. He also testified that burglary is the gang's signature crime. It was common for gang members to burglarize homes in affluent communities outside Los Angeles.

Martinez had spoken to defendant on a number of occasions. He had seen defendant in claimed PJ Watts Crips territory 20 to 30 times, where defendant was wearing clothing and jewelry associated with the gang. Martinez also discussed a YouTube music video called "Gangland," where defendant and Mendez both appear, making PJ hand signs. Defendant was also in a minidocumentary called "Life in PJ Watts Crips Projects, a HoodVlog," with numerous other individuals, discussing involvement with gang life. Defendant also appeared on social media with clothing and

6

conduct that was consistent with his membership in PJ Watts Crips. Defendant also has numerous gang tattoos.

Based on this information, Martinez opined that defendant is an active participant in the PJ Watts Crips street gang. When given a hypothetical that mirrored the circumstances of the instant burglaries, Martinez also testified that the conduct would benefit and be in association with members of PJ Watts Crips. He stated obtaining property from the burglaries would bring in funds for recruitment and having luxury items would encourage others to join the gang. Firearms would benefit the gang and be used in other crimes, or to instill fear in the community or to protect themselves from rivals.

The parties stipulated that Mendez and another participant in the burglaries, Donmeion Gusters, were active participants in PJ Watts Crips during November and December 2019, that PJ Watts Crips was a criminal street gang as defined in section 186.22, subdivision (f). The members engaged in a pattern of criminal gang activity, and the primary activities of the gang were crimes listed in section 186.22, subdivision (e)(1).

Prior to trial, defendant moved to suppress a great deal of evidence (virtually everything obtained after Miranda placed the GPS tracker, including the phones and the items found after the pursuit). He argued that the GPS tracker was illegally placed on his vehicle. The trial court denied the motion, finding that defendant's parole status made the placement of the tracker permissible.

At the conclusion of trial, the jury found defendant guilty as charged and all enhancements true. The court later found all the allegations regarding defendant's priors were true.

During sentencing, the court granted defendant's request to strike both of the prior convictions for sentencing purposes. The court imposed a total sentence of 21 years, 4 months. Defendant now appeals.

7

II

DISCUSSION

*Motion to Suppress*

Defendant argues his motion to suppress should have been granted because Miranda "had only a vague and uncorroborated understanding that" defendant was on parole when he placed the GPS tracker.

"Challenges to the admissibility of evidence obtained by a police search and seizure are reviewed under federal constitutional standards." (*People v. Schmitz* (2012) 55 Cal.4th 909, 916 (*Schmitz* ).) "A warrantless search is unreasonable under the Fourth Amendment unless it is conducted pursuant to one of the few narrowly drawn exceptions to the constitutional requirement of a warrant." (*Ibid.*) "California's parole search clause is one of those exceptions." (*Ibid.*)

The trial court, in its ruling on defendant's motion to suppress, found the placement of the GPS tracker constituted a search. The court, however, rejected defendant's contention that it was relevant that Miranda had not received permission from defendant's parole officer to place the tracker, finding that such permission was unnecessary. But the court ultimately found that defendant's status as a parolee, and the fact that he was driving the car, were determinative, unless placement of the tracker was arbitrary, capricious, or harassing. Based on Miranda's testimony about the investigation, the court found no indication of this. Accordingly, the court denied the motion.

On appeal from the denial of a motion to suppress (§ 1538.5), our standard of review is well settled. We defer to the trial court's express or implied factual findings if supported by substantial evidence, but independently apply constitutional principles to the trial court's factual findings in determining the legality of the search. (*People v. Redd* (2010) 48 Cal.4th 691, 719.) Our review, which is governed by federal constitutional standards (Cal. Const., art. I, § 28), "is confined to the correctness or incorrectness of the

8

trial court's ruling, not the reasons for its ruling." (*People v. Dimitrov* (1995) 33 Cal.App.4th 18, 27.)

In California, parolees may validly consent in advance to warrantless searches in exchange for the opportunity to avoid or obtain release from custody. (*People v. Woods* (1999) 21 Cal.4th 668, 674.) Every inmate eligible for release on parole is subject, by statute, "to search or seizure . . . at any time." (§ 3067, subd. (b)(3).) Parolees are given notice of this requirement upon release. (*Schmitz*, *supra*, 55 Cal.4th at p. 916.)

The California Supreme Court has repeatedly said such searches are lawful. (*People v. Woods*, *supra*, 21 Cal.4th at p. 675.) There are only two requirements: the parolee's status must be known to the officer, and the search may not be "arbitrary, capricious, or harassing." (*Schmitz*, *supra*, 55 Cal.4th at p. 916.)

Defendant claims that Miranda's knowledge of his parole status was "vague and uncorroborated." He further argues that the officer's knowledge must come from "official sources" and did not in this case. But the record does not reflect that. On direct examination, the prosecutor asked Miranda: "[A]t the time you placed the tracker on the vehicle, were you aware that [defendant] was on parole in the State of California?" Answer: "Yes." Miranda was asked, on cross-examination: "You indicated earlier that prior to your arrival . . . you understood that [defendant] was on parole; is that correct?" Miranda answered: "Yes." Counsel then went on to ask about Miranda's knowledge of "specialized conditions of parole" but did not ask how Miranda learned of defendant's parole status. Thus, based on the answer to this question, Miranda did not learn of defendant's parole status at the scene, where he had admitted it to another officer, but had learned of it prior to his arrival. There is no reasonable implication to be drawn from this testimony that Miranda's understanding of defendant's parole status (which was incontrovertibly true) was "vague or uncorroborated." While defendant claims Miranda

9

"was unable to articulate how" he knew defendant was on parole, this is not the case. He was simply never directly asked this question.

This is unsurprising, because ultimately, when a defendant is on parole, the source of the officer's knowledge is not legally meaningful. Defendant, in support of the contention that the officer's knowledge must come from an official source, relies primarily on a case involving a probationer, not a parolee. *(People v. Romeo* (2015) 240 Cal.App.4th 931 (*Romeo*).)

Romeo addressed whether a warrantless search was reasonably based on the police officer's subjective understanding that the defendant was on probation. (*Romeo*, *supra*, 240 Cal.App.4th at p. 949.) The trial court was required to analyze whether the belief that the probationer had consented to a specified type of search was "*reasonable* in light of the total mix of information known to [the officer]." (*Ibid.*) The reason why this is important in a probation case was because the scope of a permissible search is governed by the specific terms of probation for the individual probationer. In *Romeo*, because the probation terms were not in evidence, "there is nothing in the record to aid an objective evaluation of the scope of advance consent that was given." (*Id.* at p. 950.)

The court in *Romeo* went out of its way to distinguish parole and probation in this context. "Unlike the parole context, where the scope of permissible search is imposed by law -- and deemed known to the searching officer from nothing more than the fact that someone is on parole -- a probationer's expectation of privacy, and hence the reasonableness of a warrantless search, may vary depending on the scope of advance consent." (*Romeo*, *supra*, 240 Cal.App.4th at p. 950, fn. omitted.) "The omission of any particulars concerning the authorized scope of the search is not a minor detail. Unlike parole searches -- where a searching officer's knowledge of a person's parole status *alone* is enough to justify a search of the parolee's person or any property under his control,

10

including his residence -- the permissible scope of a probation search is circumscribed by the terms of the search clause, and the scope may vary." (*Id.* at p. 951.)

*Romeo* is entirely limited to the probation context and has no applicability to a defendant on parole. Indeed, it only reinforces the difference between the two. The other cases on which defendant relies either do not apply here or do not stand for the proposition that "the officer must base his information about parole status on information from official channels." *People v. Brown* (2015) 61 Cal.4th 968, states no such thing. It states that police "*may arrest or detain a suspect* 'based on information received through "official channels." '" (*Id.* at p. 983, italics added.) When challenged, the prosecution must prove the information came from somewhere other than the officer's "imagination." (*Ibid.*) The line of case law from *People v. Harvey* (1958) 156 Cal.App.2d 516, and *People v. Madden* (1970) 2 Cal.3d 1017, simply has no relevance when the issue is a parole search and is inapplicable here. The Supreme Court has repeatedly stated that the officer must have knowledge of a parolee's status. (*Schmitz*, *supra*, 55 Cal.4th at p. 916.) Here, Miranda did have such knowledge before he arrived on the scene of the traffic stop. Further, his knowledge was indisputably correct.[3]

Defendant offers no argument that the search qualified as harassing, arbitrary, or capricious. Accordingly, we find the trial court did not err in denying defendant's motion to exclude the fruits of the warrantless search. Because the warrantless search was lawful, we need not consider defendant's add-on argument regarding the contents of the search warrant affidavit.

---

[3] Defendant admits Miranda was not asked about the source of his knowledge that defendant was on parole and claims this was "error." In a rather pro forma argument regarding ineffective assistance of counsel, defendant argues counsel asserted "the wrong ground for the suppression motion." For the reasons stated above, we disagree.

11

*Changes to Law Regarding Street Gang Terrorism and Enhancements*

As mentioned previously, defendant was convicted of the substantive crime of street terrorism, and the street gang enhancements to five of the counts were found true.

By way of background, at the time this case was tried, the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.) included a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with a criminal street gang" (§ 186.22, subd. (b)(1)). (See *People v. Valencia* (2021) 11 Cal.5th 818, 829.) To establish a gang is a "'criminal street gang,'" the prosecution must prove the gang has as one of its "primary activities" the commission of one or more of the crimes enumerated in former section 186.22, subdivision (e) (Stats. 2021, ch. 699, § 4, eff. Jan. 1, 2022; Assem. Bill No. 333 (2020-2021 Reg. Sess.)) (A.B. No. 333), and it has engaged in a "'pattern of criminal gang activity'" by committing two or more such predicate offenses. (Former § 186.22, subds. (e), (f).)

After trial in this matter, A.B. No. 333 made substantial revisions to section 186.22. "Most notably, the law defined 'to benefit, promote, further, or assist' as 'to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' (§ 186.22, subd. (g).) In addition, the law created a stricter requirement for proof of 'a pattern of criminal gang activity,' which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subd. (f).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (See former § 186.22, subd. (e).) Under the newly amended law, the offense with which the defendant is currently charged cannot be

12

used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang 'members,' and must have been for the 'common[] benefit[] [of] a criminal street gang.' (§ 186.22, subd. (e)(1).) Finally, under Assembly Bill No. 333, the defendant may request a bifurcated trial, in which the defendant is first tried for the underlying offense, and only upon conviction is tried for any gang enhancements. (§ 1109, subd. (a).)" (*People v. Sek* (2022) 74 Cal.App.5th 657, 665.)

### 1. Retroactivity

Appellate courts have issued conflicting decisions on the issue of retroactivity of section 1109. (Compare *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090, with *People v. Burgos* (2022) 77 Cal.App.5th 550, 565-567, review granted July 13, 2022, S274743.) We need not address whether section 1109 applies retroactively here because, even assuming retroactivity, defendant was not prejudiced by any failure to bifurcate the gang allegations. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 [rejecting defendant' claim of structural error].)

### 2. Any Error Was Harmless

We reject defendant's brief argument that the failure to bifurcate requires reversal unless it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) "'[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.'" (*People v. Tran*, *supra*, 13 Cal.5th at p. 1209.) We find no indication that the gang evidence was of such a character as to render the trial fundamentally unfair. Much of the gang evidence was also admissible to demonstrate guilt, but even putting that fact to the side, it was not so overwhelming or voluminous that it fundamentally altered the nature

13

of the trial and rendered it unfair.  The bulk of the testimony in this case was about the facts related to the burglaries.

Accordingly, we apply the *People v. Watson* (1956) 46 Cal.2d 818, standard for error under state law.  The defendant must establish that it is reasonably probable defendant would have obtained a more favorable result without the error.

We find no reasonable probability whatsoever that even had the gang allegations been bifurcated and all of the gang evidence had been excluded that any reasonable jury would have reached a different outcome on the robbery counts.  The evidence was simply overwhelming, as set forth above.  Defendant was detained after a police pursuit where officers found a Gucci purse stolen from a Poway home earlier that day that had been thrown out of a window.  The defendant's e-mail address was logged into a phone found in the car.  The same phone, which had visible photos of defendant, was, according to cell phone tower data, at the locations of the various burglaries discussed forth above.  Defendant had been seen driving the white Audi that was in surveillance video at the Manhattan Beach burglary.

It is proper for this court to consider "'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Rogers* (2006) 39 Cal.4th 826, 870.)  Such is the case here.  Even if the word "gang" had never been mentioned at any point during the trial, no reasonable jury would have found the defendant not guilty of the charged burglaries.  Accordingly, we find any error was harmless.

### III

### DISPOSITION

The judgment is affirmed.


                                        MOORE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.